**DEL MANUFACTURING COMPANY**

v.

**UNITED STATES of America, et al., Appellants.**

**No. 83–1094.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1983.

Decided Dec. 23, 1983.

As Amended Dec. 23, 1983.

William J. Birney, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellants. William Kanter and Charles D. Ossola, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellants.

Peter N. Weiss, Washington, D.C., with whom Dennis J. Riley, Washington, D.C., was on the brief for appellee.

Before TAMM, WALD and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge WALD.

STARR, Circuit Judge:

This case arises under the Equal Access to Justice Act, 28 U.S.C. § 2412 (Supp. V 1981). Under section 204 of that Act ("EAJA"), a court in a suit brought by or against the United States is directed to award attorneys' fees to a private prevailing party who satisfies certain financial eligibility requirements, unless "the position of the United States was substantially justified" or "special circumstances make an award unjust." Contesting the district court's award of attorneys' fees in this case, the government contends that under this court's supervening decision in *Spencer v. NLRB,* 712 F.2d 539 (D.C.Cir.1983), "the position of the United States" within the meaning of the EAJA must be construed as the government's position during litigation, not governmental conduct prior to the initiation of legal proceedings. As *Spencer* was decided after the district court's decision, we now conclude, for reasons to be set forth below, that *Spencer* controls the instant case and that, accordingly, the award of attorneys' fees cannot stand.

## I

The story before us began uneventfully enough in August 1981 when the Navy Regional Contracting Center ("NRCC" or the "Navy") in Long Beach, California decided to obtain approximately 600,000 bomb cartridges for practice maneuvers during the following summer. The estimated value of this proposed procurement was approximately $2.1 million. In September .1981, the Small Business Administration ("SBA") proposed that NRCC reserve the cartridge procurement for Del Manufacturing Company ("Del") under section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (the "section 8(a) program"). Under section 8(a), which is designed to assist socially and eco-nomically disadvantaged businesses, a government agency contracts with the SBA, which in turn chooses a disadvantaged but capable company· as subcontractor to perform work or provide goods or services to the agency.

In light of SBA's recommendation, NRCC representatives visited Del's plant in California and preliminarily concluded that Del was technically capable of manufacturing the cartridges. In a letter dated October 21, 1981, NRCC requested SBA to authorize Del to enter into negotiations. Foreshadowing the events which gave rise to this litigation, NRCC indicated that it intended to make the final contract award no later than December 31, 1981.

In contrast to the defense community's interest in prompt procurement,[1] SBA's procedures are designed to promote accuracy and reliability in large procurement decisions even at the expense of expedition. Thus, before authorizing a firm in the section 8(a) program to negotiate on SBA's behalf, SBA is required under governing procedures to perform a detailed review of the company's financial, technical and operational capabilities to perform the contract. Moreover, contracts over $2 million, like this one, require review by the Office of the SBA Administrator in Washington, D.C.

In the instant case SBA's evaluative task was complicated by a fire that damaged Del's plant in the fall of 1981. Despite uncertainty about the effects of this misfortune on Del's capabilities, SBA's district office in Los Angeles recommended in November 1981 to SBA's regional office in San Francisco that Del be certified to negotiate and perform the contract. SBA's regional office, however, expressed concern over Del's apparently weak financial condition, exacerbated by the recent fire, and accord-

---

[1] Under applicable Department of Defense regulations designed to protect the military's interest in prompt procurement, SBA is required within ten days of receipt of such a request to initiate negotiations. 32 C.F.R. § 1–705.-5(c)(1)(C) (1981). If negotiations are not begun within the requisite period, the procurement agency must notify the SBA that it intends to proceed outside the section 8(a) program, unless the SBA requests additional time that can be granted without threatening the punctuality of the procurement. *Id.* SBA must also certify that the subcontractor will be able to perform its obligations under the proposed contract. 32 C.F.R. § 1–705.5(c)(1)(D) (1981).

ingly on November 27, 1981, asked for more information.

As SBA's wheels were languidly grinding, the Navy's patience was wearing thin. NRCC expressed displeasure about the prolonged SBA review, whereupon in December 1981, SBA formally requested additional time to certify Del. The Navy agreed to the request. A breakthrough then seemingly occurred on December 14, when an official in SBA's regional office, assuming that he had authority to authorize a contract of this size, informally told the NRCC that it could begin negotiations with Del.[2] Inasmuch as the SBA Administrator's approval was necessary for a procurement of this size, however, the continuing process of SBA review wore on deeply into December. The California phase of SBA review finally concluded on December 17, when the San Francisco regional office recommended to SBA's Washington headquarters that Del be certified for the contract.

Further delays, however, attended SBA's review, inasmuch as SBA headquarters raised questions anew about Del's financial and operational capabilities and since the regional office's recommendation arrived in Washington with the advent of the holiday season. As the New Year dawned, NRCC sent a telegram on January 11, 1982, to SBA imposing a deadline of January 15. SBA immediately asked for an extension until January 22. The NRCC contract officer, however, refused to extend the deadline when SBA represented that it was uncertain whether a final decision would in fact be reached by the proposed extended date. True to its word, NRCC cancelled its request for procurement to SBA on January 15, 1982.

Realizing that his company's potential contract was in grave danger, Del's president immediately traveled to Washington in an effort to salvage the contract. Meeting with SBA officials on January 18, 1982, Del's president recommended that SBA invoke an intragovernmental dispute resolution mechanism that he thought applicable to the situation at hand. When these efforts on the morning of January 18 bore no immediate fruit, Del filed suit that afternoon in the United States District Court for the District of Columbia, seeking to enjoin NRCC from rescinding its request for procurement. At a status hearing on the day the suit was filed, the government, through an Assistant United States Attorney, agreed that NRCC would forebear until January 22 for the SBA's hoped-for certification.

Events finally moved toward a happy conclusion on the next day, when SBA's Deputy Administrator recommended that Del be certified.[3] At long last, and prior to the January 22 deadline, the SBA Administrator on January 21 officially authorized Del to negotiate the contract. Del's federal court action was, accordingly, dismissed by the parties' mutual consent on March 18, 1982.

This tale of two agencies would have thereupon ended, but for Del's seeking attorneys' fees under the Equal Access to Justice Act. In a memorandum opinion, the district court awarded Del fees and expenses in the amount of $4,275.04. Determining that Del was a "prevailing party," the court interpreted "the position of the United States" as including government action *preceding* litigation. The court found that while each agency's action, considered separately, might be deemed reasonable, their combined actions placed Del in an "absurd" position and were not "substantially justified." This appeal followed.[4]

---

2. Five days earlier, on December 9, NRCC had approached Del directly and asked it to proceed with contract preparations. On December 22, Del submitted a contract proposal to NRCC. Del thus incurred some start-up costs.

3. The Deputy Administrator's analysis of Del's financial condition suggests that the SBA's concern over Del's capabilities was not unfounded. The report showed that company had a working capital deficit of $720,000 and a deficit net worth of $337,000.

4. Appellants dispute in passing the district court's ruling that Del is a "prevailing party" under the EAJA. In a footnote in their brief appellants argue that a party is a "prevailing party" under the EAJA only if it obtains "relief on the merits of a claim central to its case." Because this case became moot when the SBA

## II.

### A.

After the district court's decision awarding attorneys' fees to Del, this court handed down its decision in *Spencer v. NLRB, supra.* In a detailed and careful opinion, the *Spencer* court chose between two possible interpretations of the statutory phrase, "the position of the United States." One interpretation, the "underlying action" theory, construed the statutory language as referring to the governmental action precipitating the lawsuit. The second interpretation, the "litigation position" theory, construed the term as referring to the "posture assumed by the government in litigation." 712 F.2d at 546. Although the court in *Spencer* examined carefully the statutory language and canvassed fully the EAJA's legislative history, the court's holding was founded principally upon the analysis of five hypothetical, representative situations in which a party's application for fees would result in a different outcome depending upon whether the "underlying action" theory or "litigation position" theory was applied. *Spencer* found that in each of the five representative situations application of the "litigation position" theory better comported, on balance, with the "complex of concerns" underlying the EAJA. Accordingly, the court adopted the "litigation position" theory, concluding that "the position of the United States for the purposes of the Act means the arguments relied upon by the government in litigation." *Id.* at 557.

In *Spencer*'s wake, Del now seeks to demonstrate that the court's square holding in favor of the "litigation position" theory should not apply to this case. Specially, Del argues that *Spencer* deemed the "litigation position" theory superior in the context of an example (the fifth example in *Spencer*'s analysis ("Example Five")) akin to the present circumstances, inasmuch as the "litigation position" theory would encourage resort to informal settlement attempts before the initiation of court proceedings.[5] *Spencer, supra,* 712 F.2d at 556. Conceding that Example Five "superficially" resembles this case, Del nonetheless argues that its informal attempts to persuade the NRCC to refrain from cancelling the procurement request and to persuade SBA to invoke a special dispute resolution process before resort to litigation renders *Spencer*'s rationale inapplicable, because no further incentive for informal dispute resolution was needed.

This argument misconstrues the nature of *Spencer*'s holding.[6] While *Spencer* tested both the "litigation position" and "underlying action" theories against five representative situations to determine which theory better comported with the EAJA, *Spencer*'s holding was by no means limited to those examples. To the contrary, *Spencer* by its terms constitutes the definitive construction in this circuit of the phrase, "the position of the United States." A contrary conclusion would not only be at war with *Spencer*'s plain language and with subsequent precedent in this circuit,[7] but

authorized Del to negotiate the contract on its behalf and was subsequently voluntarily dismissed, appellants contend that the merits were not reached. In view of our disposition of the case we need not reach this issue.

5. For a discussion of the facts of Example Five see part II.C., *infra.*

6. We note that even on its own terms Del's argument is flawed. The invocation of the interagency dispute resolution mechanism of 32 C.F.R. § 1–705.5(a) was inappropriate here since the regulation's applicability presupposes that SBA had certified that Del was competent to perform the contract. The problem in this case was that SBA had not yet made such a certification at the time suit was brought.

Second, the *Spencer* court's finding that the "litigation position" theory was superior in the context of Example Five did not rest solely on the factor of encouraging informal dispute resolution. *Spencer* clearly emphasized the waste of judicial resources entailed in forcing courts to reach the merits of a case in which the government immediately surrendered in order merely to decide whether the "position of the United States" was substantially justified. 712 F.2d at 556 n. 60. That rationale is fully applicable to this case.

7. *See Environmental Defense Fund v. EPA,* 716 F.2d 915, 920 (D.C.Cir.1983) ("Recently, in *Spencer v. NLRB* we held that the position of the United States means 'the arguments relied on by the government in litigation.' ") (citation

would lead to the curious result that the meaning of statutory language would vary according to the facts in individual cases. Although courts have been divided on the meaning of "the position of the United States," *see Spencer, supra,* 712 F.2d at 546 nn. 27 & 28, no court has suggested, as Del now does, that the statute's meaning should be chameleonic.

At oral argument Del advanced a variation of this theme, contending that, despite *Spencer,* a court should consider as part of the government's "litigation position" governmental actions during the period when a prospective plaintiff sought informally to settle the dispute without resort to litigation. This proffered understanding, however, defies the common-sense meaning of "litigation" and "litigation position." In ordinary parlance, litigation begins when a complaint is filed and served.[8] Because there exists a range of informal, pre-litiga- tion activities for a private party seeking to negotiate with an agency, the failure to employ the bright line marked by the filing and service of a complaint will inevitably lead to, at best, uncertainty, and, at worst, arbitrariness in determining the meaning of the government's "litigation position."[9]

### B.

Once we substitute *Spencer*'s interpretation of "the position of the United States" for that embraced by the district court, it is beyond cavil that the government's position in this case is "substantially justified." The reason is clear. Under *Spencer*'s holding, our focus moves from the SBA's torpor and tardiness and from the NRCC's precipitous action occasioned by its impatience with the SBA and shifts instead to the government's position once Del filed its complaint. That position is undisputed and simply stated.[10]

---

omitted). The *EDF* holding is discussed more fully at part II.C., *infra.*

**8.** This approach toward "litigation position" finds support in the legislative history consistent with the theory adopted by *Spencer. See, e.g.,* H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11 (1980); S.Rep. No. 253, 96th Cong., 1st Sess. 6–7 (1979) ("A court should look closely at cases ... where there has been a judgment on the pleadings or where there is a directed verdict or where a prior suit on the same claim has been dismissed. Such cases clearly raise the possibility that the Government was unreasonable in pursuing the litigation.") For other statements suggesting that those legislators who conceived "the position of the United States" to be the government's litigation position were focusing on the government's action after a complaint was filed, see, *e.g.,* 126 Cong. Rec. 10,230 (daily ed. October 1, 1980) (statement of Rep. Broomfield); *id.* at 10,222 (statement of Rep. Danielson); 125 Cong.Rec. 21,439 (1979) (statement of Sen. Ford).

**9.** Moreover, we note that because in almost every case a private party will likely have had some informal contact with an agency, Del's expansion of "litigation position" to include actions after informal contact has been initiated is in effect a method of resuscitating *pro tanto* the "underlying action" theory rejected by *Spencer.*

**10.** The dissent contends that the government effectively conceded Del's claim by the actions it took after Del filed its complaint. This description, of which the dissent makes consider-

able use, does not fairly characterize the government's position. The government never conceded in this case that it did not have the legal right to cancel the section 8(a) procurement; to the contrary, the government chose to delay the test on the legal merits in the hope that the issue would be resolved without further litigation and without further cost. Because of the success of this strategy, the government never had occasion to file a responsive pleading or motion detailing any potential substantive and procedural legal defenses.

Once the government's action after Del filed its complaint is accurately characterized, there can be no reasonable doubt, contrary to the dissent's implication, that the government had, however briefly, a litigating position. Taking action in court designed to lead to a dissolution of the dispute without testing the ultimate legal merits of the complaint is plainly a litigation position. Surely it would not be claimed that one has a litigation position only while engaging in maneuvers over substantive legal questions. Inasmuch as the government did indeed have a litigation position in this case, *Spencer*'s holding that the government's litigation position, rather than the underlying agency action, must be evaluated to determine whether the position of the United States is "substantially justified" is controlling. This would be true even if we were to believe, as the dissent impliedly does, that *Spencer* was wrongly decided.

Furthermore, the dissent's assumption that the government knew it had no case permits it to avoid the considerable force of *Spencer*'s

At the status hearing on the day the complaint was filed, the government agreed that NRCC would wait until January 22 for SBA's certification and would take no action in the meantime to endanger Del's interest in the procurement. This course of conduct brought Del full relief within three days of filing suit. Two months later the case was voluntarily dismissed.

The actions of the government here *during litigation* were entirely reasonable. Indeed, Del admits as much, conceding at oral argument that after suit was filed, the government's actions were "eminently reasonable." We find no fault in that formulation. Since in this circuit the test for whether government action is substantially justified is "slightly more stringent than one of reasonableness," *Spencer, supra,* 712 F.2d at 558, actions that are, as here, "eminently reasonable" clearly meet that test.

Del nonetheless contends that *Environmental Defense Fund v. EPA,* 716 F.2d 915 (D.C.Cir.1983), a decision handed down by this court after *Spencer,* suggests that an award of fees is warranted in this case. We disagree. *EDF* expressly adhered to *Spencer's* construction of "the position of the United States," 716 F.2d at 920, but concluded that the government's litigation position in the particular circumstances at issue in that case was not substantially justified. A review of the course of litigation between EDF and the government in that case, however, demonstrates persuasively that the events at issue there bear no resemblance to the facts of this case.

In *EDF,* EPA decided in February 1982 to suspend three reporting requirements concerning hazardous waste disposal until August 1, 1982. Months before this reinstatement date, on March 31, 1982, EDF filed a petition for review in this court, claiming that the agency's suspension of the reporting requirements had unlawfully been effected without public notice and comment. EPA and EDF thereupon engaged in settlement negotiations for four months while this court held EDF's appeal in abeyance; the negotiations, however, proved fruitless. When the August 1 deadline passed, thereby putting two reporting regulations back into effect, EPA refused EDF's request to publish a *Federal Register* notice announcing the regulations' reinstatement. In the face of EPA's refusal, EDF filed a merits brief in the case on September 24. Finally, on October 12, EPA published the requisite notice in the *Federal Register,* thereby providing "essentially all the relief that EDF had wanted," 716 F.2d at 917, and, accordingly, mooting the case.

In *EDF,* therefore, the actions constituting the government's litigation position stretched over *six months* before the plaintiff obtained relief. Moreover, this court found that EPA's refusing for over two months to publish a notice in the *Federal Register* after the reporting requirements went back into effect and while the litigation continued "was exactly the type of arbitrary governmental behavior that the EAJA was designed to deter." 716 F.2d at 921. In stark contrast to the government's

observations in the context of Example Five concerning unnecessary litigation. The government attorney here faced a choice between pressing the legal issues of the case to an uncertain conclusion or taking a position which might bring about a resolution favorable to the opposing party at no cost to the government. The knowledge that pursuing the latter course could nevertheless result in a long attorneys' fee proceeding and an ultimate judgment against the government would, in the mind of any rational decision maker, weigh against choosing that course. Thus, on balance, the imposition of attorneys' fees in such cases would encourage litigation with all its associated costs to the government, private parties, and the courts.

Moreover, by assuming that the government's ultimate legal case was known to be hopeless, the dissent avoids confronting *Spencer's* argument that the process of awarding fees in cases like the instant one will waste judicial resources. To evaluate whether the underlying agency action here was "substantially justified" a district court would be forced to hold a full-scale hearing on the merits of a case that became moot almost immediately after the complaint was filed. As *Spencer* stated: "It seems unlikely that Congress intended (or would have wanted) the Act to spawn otherwise unnecessary *proceedings of this kind.*" 712 F.2d at 556 n. 60.

foot-dragging condemned in *EDF,* the government conducted itself in the litigation in the instant case in what Del concedes to have been an eminently reasonable fashion that brought Del full relief immediately after the complaint was filed.[11]

### C.

We observe in closing that our decision not to award fees is clearly supported by the analysis in *Spencer* itself. In our view the government's litigation actions in this case resemble those described in one representative example fashioned by *Spencer.* In Example Five, entitled "Surrender by the Government," and to which reference was made at part II.A., *supra, Spencer* hypothesized a case in which a government contractor, believing that the United States had failed to abide by the terms of an agreement, filed suit. Under this example, the government's attorney immediately investigated the matter and concluded that the contractor's suit was meritorious; the government thereupon, without further legal proceedings, paid the contractor the amount to which he was entitled. In analyzing a hypothetical suit by the contractor to recover legal fees incurred in filing the lawsuit, the *Spencer* court concluded that while under the "underlying action" theory the contractor would prevail, under the "litigation position" theory the contractor would lose.

*Spencer*'s analysis of Example Five closely fits this case. In the instant case, the government's action after suit was instituted, like that in *Spencer*'s Example Five, brought Del immediate relief. Because the "litigation position" theory is the law of this circuit, Del, like the contractor in *Spencer*'s example, cannot recover fees.[12]

### III.

Finding this case to be controlled by *Spencer,* a decision of which the district court did not have benefit in rendering its judgment in this case, we concluded that Del is not entitled, under the now-established law of this circuit, to attorneys' fees.

*Reversed.*

WALD, Circuit Judge, dissenting:

The "position" taken by the United States in this litigation was not, in my view, "substantially justified." The government's position in court effectively conceded the appellant's claim that the contract should not be immediately cancelled; in other words, its position was that it would not—presumably could not—defend its actions vis-a-vis Del.[1] Thus, an interpretation

---

11. *Spencer* itself draws a line between a governmental litigation position that results in immediate relief to the plaintiff, such as that in the instant case, and a governmental litigation position, like that in *EDF,* which initially bars such relief. "It seems clear that, if the government does not immediately accede to the plaintiff's demand, but instead initially opposes his claims and then at some later stage (*e.g.,* in a pretrial settlement) surrenders, the United States will be liable for attorneys' fees .... Under such circumstances, not only will the government have acted unreasonably, but it will have adopted (at least briefly) a litigation position lacking substantial justification." 712 F.2d at 555 n. 58.

12. Faced with similar facts, another court which, like this circuit, has embraced the "litigation position" theory ruled that the government's position was substantially justified. In *Operating Engineers Local Union No. 3 v. Bohn,* 541 F.Supp. 486 (D.Utah 1982), a union local sought to recover attorney's fees incurred in connection with a suit under the Davis-Ba-

con Act which successfully forced the Department of Transportation to incorporate prevailing wage rates in solicitations of bids for highway construction projects. On the day the union filed suit, government counsel agreed at a TRO hearing that the Department of Transportation would not sign any construction contracts before the court held a preliminary injunction hearing eleven days later. Two days before that hearing, the union obtained the entire relief it had requested when the Department of Transportation agreed to modify the contract to include the requested wage rate. The district court, focusing on the government's "litigation posture," dismissed the petition for fees, concluding that the government's actions in the litigation—surrendering within nine days of the filing of the complaint—"have not only been reasonable, but laudable." *Id.* at 495.

1. The majority takes issue with this view of the government's "litigating position." *See* Maj.Op. at 984, 985 n. 10. It says it is more

that an immediate surrender in these circumstances is a "substantially justified" position for the United States such as to protect it from attorneys' fee liability under the Equal Access to Justice Act seems to mock both the language and the purpose of the statutory scheme. It means that the government can dally at will through the administrative process—or, as in this case, squeeze the plaintiff between two bickering agencies—and then, after forcing the plaintiff to file a suit, avoid fee liability by a prompt confession of error. This result is particularly ironic since this court has already held that if the government, without a sufficient justification, waits even a little while into the litigation to cave, as in *Environmental Defense Fund v. EPA*, 716 F.2d 915 (D.C.Cir.1983), it will be liable for attorneys' fees.

I realize that *Spencer v. NLRB*, 712 F.2d 539 (D.C.Cir.1983), if taken to the wall, might seem to mandate this result. However, I do not believe it must be so read. *Spencer* itself dealt with quite a different situation, in which the government raised a wholly valid legal argument as to why the court should not hear the plaintiff's case on the merits. *Id.* at 567. Only in dicta did the court consider a case in which the government's "litigation position" was com-

plete capitulation. *Id.* at 555–56. I do not find that dicta so persuasive that I would convert it into a holding at the expense of logic and statutory purpose. First, the court focused in its discussion of Example Five on a case in which the plaintiff acted precipitously, going to court before it gave the government a chance to resolve the dispute through its own administrative mechanisms. *Id.* at 555–56. Just the opposite occurred here. The appellant did everything it could to protect its interests and to resolve the interagency squabble before resorting to litigation. Indeed, the facts of *Spencer*'s Example Five are rather unrealistic to the extent that they suggest that one may invoke the aid of a court against agency action without regard for doctrines such as finality that are designed to permit the agency adequate opportunity to resolve disputes outside of the courts. In short, I do not believe that *Spencer*'s brief discussion in dicta of a hypothetical case superficially resembling that before us compels the majority's result.

Nor does *Spencer*'s interpretation of the statute as focusing on the reasonableness of the United States' "litigating position" rather than its underlying actions require us to accept this irrational result. The

"accurately characterized" as an attempt, once the complaint was filed, to resolve the controversy as quickly and practically as possible. The critical difference lies in our varied perceptions of what "litigating position" means. "Litigating position," of course, is only judicial shorthand for the statutory term, "position of the United States," whose meaning, in turn, must be informed by the Act's legislative history. The majority reads that term to include anything the government does after a complaint is filed, while I read the crucial language in the legislative history to require the government to "show that its case [in court] had a reasonable basis both in law and fact." *Infra* at 987, 988 (citing House and Senate reports). This language tells me that Congress intended to place a heavier burden on the government than can be met by a post-hoc rationalization of its failure to present any case at all. I point out, in that respect, that the record before us does not reveal the government's actual motivation, as opposed to its later explanation, for immediately giving the plaintiff the very relief it had withheld until the TRO was filed. Nor could we expect the record in such a situation

ordinarily to provide such information, a fact worth considering in deciding whether we wish to adopt an interpretation of litigating position that requires a case-by-case examination of the motives of counsel in cases like this. All the record shows here is that after months of interagency haggling, Del was able to rescue its contract and the substantial start-up costs already incurred only by moving in court for a temporary restraining order to stop cancellation. The government had more than ample time before that point to pursue its beneficent goal of avoiding "litigation with all its associated costs to the government, private parties, and the courts." Maj.Op. at 984, 985 n. 10. Finally, contrary to the majority's assertion, my view of what constitutes a substantially justified litigating position would not require courts "[t]o evaluate whether the underlying agency action [in cases like this] was 'substantially justified.'" *Id.* It *would*, however, require (1) that the government articulate in some fashion its position—legal or factual—as to why it should prevail in court, and (2) that a court determine whether that position was substantially justified. The statute appears to require no less.

court in *Spencer, id.* at 548, found strong support for the view that "position of the United States" meant "litigating position" in the following language from House and Senate reports: "Where the Government can show that its case had a reasonable basis both in law and in fact, no award [of attorneys' fees] will be made." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10 (1980); S.Rep. No. 253, 96th Cong., 1st Sess. 6 (1979). This language, which appears to be the clearest and most authoritative evidence in support of the view adopted in *Spencer* that Congress intended courts to evaluate the merits of the government's litigating position, seems to me completely at odds with the view that immediate surrender is a substantially justified litigating position. How can the government's admission that it has no case at all be a case with "a reasonable basis both in law and fact"? Although the majority correctly notes that the appellee took the position in oral argument that the government's litigating position was reasonable, we are not bound by this concession, particularly because it is based on what I believe is a misinterpretation of the law.

I believe that the Equal Access to Justice Act requires the award of fees to a prevailing party unless the government can show that its position *that the plaintiff should not prevail* was substantially justified. Threshold or "technical" defenses, such as the one at issue in *Spencer* or other defenses on such grounds as jurisdiction, finality, standing, or statute of limitations, as well as defenses on the merits, may of course make out a case with a reasonable, or substantially justified, basis in the law and the facts as to why the plaintiff should not prevail in court. However, immediate capitulation—the government's admission that it has no case—does not. Traditional doctrines such as ripeness and finality of agency action tend to ensure that a party cannot file a complaint against the government until after administrative measures have failed to secure relief. But even if there are cases where this is not true, such as constitutional tort actions, I believe that the government does not carry its statutory burden of demonstrating that its litigating position was substantially justified by simply conceding that it has no defenses to assert. Even where immediate capitulation is the most reasonable response to a meritorious claim, as it was here, it is not a substantially justified case with "a reasonable basis both in law and fact."

The extent of government liability that would be incurred upon immediate surrender would ordinarily be minimal—the plaintiffs' attorneys' fees for preparing a complaint and supporting papers. Nevertheless, the effect of this potential liability on the decisions of the government and the potential plaintiff would further the essential purposes of the Equal Access to Justice Act. For its part, the government would have an added incentive to resolve disputes before the point at which the plaintiff is entitled to go to court. As it stands under the alternative interpretation the government has no such incentive; it can remain intransigent throughout the administrative process and hope that the individual is unwilling to undertake the expense of challenging its action in court. If the government loses its gamble and finds itself in court nonetheless, it can then simply give up at no cost whatsoever. Yet this is precisely the kind of bullying that Congress hoped to deter by permitting the award of attorneys' fees for successful challenges to government action. *See, e.g.,* S.Rep. No. 253, *supra,* at 7 ("When there is an opportunity to recover costs, a party does not have to choose between acquiescing to an unreasonable Government order or prevailing to his financial detriment."); 125 Cong.Rec.S. 10933 (statement of Sen. Kennedy) ("We can no longer tolerate a legal system under which unreasonable government action affecting small businesses ... goes unchallenged because the victims are deterred by the legal expense involved.").

Once in court, the government lawyers under my interpretation would have an incentive to assert any and all defenses they believe to be substantially justified rather than immediately conceding to the plaintiff. This does not disturb me. First, there is no

reason to believe that the government would otherwise abstain from asserting reasonable defenses. Second, the government must take into account not only the possibility of escaping fees altogether by mounting a substantially justified defense but also the possibility of greater liability if its defenses are found not to be substantially justified down the line. On balance I don't believe that the marginal exposure to liability for fees in cases of immediate surrender should or will weigh significantly in government responses to litigation.

The potential plaintiff might have a slightly greater incentive to bring suit under my interpretation. However, the marginal possibility of fees upon immediate surrender could only affect the plaintiff's decision when it believes it has a sure winner—a case against which no substantially justifiable defenses can be asserted. The possibility that some such cases that could be resolved more informally will instead be resolved in the context of litigation is, nonetheless, far outweighed in my mind by the prospect created by the other interpretation, *i.e.*, that some sure winners—cases in which the government's conduct is indefensible—may not be brought to court and resolved at all because of the noncompensable expense of litigation. Again, Congress set out to remedy just this problem in permitting the assessment of attorneys' fees against the government.

This court has taken a fundamentally different position on the scope of the Act from the Third Circuit. *NRDC v. EPA,* 703 F.2d 700 (3d Cir.1983). Yet I find Judge Gibbons' *crie de coeur* on the effects of that interpretation generally to be especially disquieting in a case like this. Under the panel's ruling,

> ... no matter how outrageously improper the action has been, and no matter how intransigently a wrong position has been maintained prior to the litigation, and no matter how often the same agency repeats the offending action, the statute has no application so long as employees of the Justice Department act reason-

ably [at the first moment] when they appear before the court.

*Id.* at 706–07. I do not believe that *Spencer* requires us to embrace this result under the circumstances of this case: Any litigator [and judge] knows that to "act reasonably" in court is not necessarily the same as to have a substantially justified litigating position. Often, as here, the path of reason lies in recognizing one does not have any rational litigating position and acting accordingly by conceding.

Even if the main battle has been lost for Judge Gibbons' point of view in this circuit, the wiping-up operations performed by the present ruling are unnecessarily thorough to my thinking. The Justice Department's concession in the courts that it cannot defend the government's actions in this case is not a "substantially justified" litigating position, and I would therefore affirm the district court's grant of attorneys' fees to the appellant under the Equal Access to Justice Act.