COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|   |   |   |
|---|---|---|
| § | | |
| STEVEN PAINTER, TONYA WRIGHT, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF EARL A. WRIGHT, III, DECEASED, VIRGINIA WEAVER, INDIVIDUALLY AND AS NEXT FRIEND OF ALBERT A. CARILLO, A MINOR, TABATHA P. ROSELLO, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ALBERT CARILLO DECEASED, | § § § § § § § § | No. 08-13-00272-CV<br><br>Appeal from<br><br>83rd District Court<br><br>of Pecos County, Texas<br><br>(TC # P-6666-83-CV) |
| Appellants, | § | |
| v. | § | |
| SANDRIDGE ENERGY, INC., | § | |
| Appellee. | § § | |

**O P I N I O N**

In this appeal we are asked to explore the limits of vicarious liability. The relatives of two deceased oil field workers, and an injured oil field worker, seek to hold the owner of a drilling lease responsible for a tragic automobile accident occurring miles away from the drilling site. The accident occurred as the workers were driving to a company owned bunkhouse following the end of their shift. For the reasons noted below, we affirm.

## FACTUAL SUMMARY

The trial court granted a summary judgment in favor of Sandridge Energy, Inc. (Sandridge) in a personal injury suit brought by Steven Painter, joined with wrongful death claims brought on behalf of Earl Wright and Albert Carillo (collectively Appellants). On July 28, 2007, Earl Wright, Albert Carillo, and Steven Painter were riding in a vehicle being driven by their crew leader, J.C. Burchett. They were all employees of Amerimex Drilling I, Ltd. (Amerimex). They had finished their shift and were driving to a "bunkhouse" provided by Amerimex which was located some 30 to 40 miles away. Wright and Carillo were killed, and Steven Painter was injured in the crash. The defendants below include Burchett (the driver), Amerimex (which was hired to drill an oil and gas well) and Sandridge (the owner of the oil and gas lease).

While the parties disagree as to the implication of the summary judgment evidence, the facts themselves are mostly undisputed. Sandridge obtained a lease to drill oil and gas wells on the Longfellow ranch which is located south of Fort Stockton. Sandridge hired Amerimex to do the actual drilling. Amerimex was hired under a "Daywork Drilling Contract" that contemplated the drilling could take as long as ninety days. Sandridge was to pay Amerimex a designated daily rate during this ninety day period. In exchange, Amerimex was to provide a drilling rig and a crew each day. The contract describes Amerimex as an "independent contractor" but also states its crew was to work under the "direction, supervision and control" of Sandridge.

In addition to the daily rate that Sandridge was to pay Amerimex, it was obligated under the contract to pay three "bonus" amounts to Amerimex employees. It was obligated to pay an unspecified amount as a "bottom hole bonus" to each worker who labored during a specified period with no lost time for safety. It was to pay $50 a day to each worker as a "subsidence

2

bonus." It was also to pay each "driller" a bonus of "$50/day to drive crew out to well location [sic]." A driller is the leader of a crew consisting of four to six workers. Amerimex would invoice Sandridge for these amounts, which when paid, would then be distributed to the workers along with their regular pay. Sandridge needed to pay these bonuses because otherwise there was a risk that Amerimex' crew would be hired away by other drilling companies operating in the area.

Burchett was a driller for Amerimex and his crew consisted of Painter, Carillo, and Wright. Amerimex also had a "tool pusher" who stayed on-site and who supervised the drilling crews. Sandridge had its own on-site supervisor who stayed in a trailer at the worksite. But Sandridge otherwise did not allow on-site housing which effectively required Burchett and his crew to commute to the well site. The crew apparently lived in Big Spring and Abilene which were several hours away. Accordingly, Amerimex placed a "bunkhouse" in Fort Stockton which was some 30 miles away. There was testimony that Sandridge insisted on the bunkhouse being in Fort Stockton. But there was no requirement that the crews live in the bunkhouse, or that they had to ride with their driller when going to and from work. As it turned out, Burchett was the only one with a vehicle so they all did in fact travel with him.

Burchett's crew worked from 6 p.m. to 6 a.m. for seven days on, and then they got seven days off. On the morning of July 28, 2007, after finishing their sixth shift, they got into Burchett's personal vehicle and were driving to the bunkhouse. For reasons unknown, Burchett ran into the back of another car while on U.S. 385 just outside of Fort Stockton. Wright and Carillo were killed and Painter was injured. Burchett testified that no one from Sandridge instructed him on how to drive, or for that matter, how he did his job at the well site.

3

The live petition on file at the time of the summary judgment alleged that Sandridge was responsible for the conduct of Burchett for three reasons. First, Appellants alleged that Sandridge controlled the "mission" of transporting crew members to and from the work site by "providing a financial incentive" for Burchett to transport the crew in his personal vehicle. Appellants contend this arrangement benefited Sandridge by insuring the crew foreman (Burchett) would have his complete crew arrive each day at the worksite. Alternatively, Appellants claimed that Burchett was Sandridge's agent by virtue of the $50 transportation bonus. Finally, Appellants allege that he was Sandridge's borrowed servant.

Sandridge moved for summary judgment under both TEX.R.CIV.P. 166a(c) and (i). Its First Amended Motion for Summary Judgment claims that Sandridge was not liable under respondeat superior for the acts of Burchett because Burchett was not an employee of Sandridge; Sandridge had no right of control over Burchett at the very instance of the occurrence of this accident; and Sandridge was not liable for the acts of an employee of an independent contractor. It separately contended it was not liable as a matter of a law under agency and borrowed servant law.[1] Sandridge also filed a supplement to the motion for summary judgment which claimed that even if it controlled the details of Burchett's work to the degree of an employer, there was still no duty owed because Burchett was off work and had left the work site at the time of the accident. The trial court granted the motion but did not specify the grounds upon which it was granted.

Appellants attack the trial court's judgment via three issues. In Issue One, Appellants contend that there are genuine issues of material fact over whether the drilling contract gave Sandridge a contractual right of control over Burchett, or whether Sandridge exercised actual

---

[1] It further contended it was not liable under a joint enterprise theory which was pleaded in Appellants' Second Amended Petition, but not carried forward to the Third Amended Petition which was the operative pleading at the time of the summary judgment hearing. No issue is raised as to the joint enterprise theory on appeal.

control over the transportation through the driving bonus arrangement. In Issue Two, Appellants claim that there were genuine issues of material fact as to whether Burchett was acting as an employee of Sandridge at the time of the accident. In Issue Three, they alternatively claim there was some evidence that he was a borrowed servant.

## STANDARD OF REVIEW

We review a trial court's decision to grant summary judgment *de novo*. *Travelers Insurance Company v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). Rule 166a(i) permits a party to move for a no-evidence summary judgment "without presenting summary judgment evidence," but it requires the moving party to "state the elements as to which there is no evidence." TEX.R.CIV.P. 166a(i); *Wade Oil & Gas, Inc. v. Telesis Operating Company, Inc.*, 417 S.W.3d 531, 540 (Tex.App.--El Paso 2013, no pet.); *Aguilar v. Morales*, 162 S.W.3d 825, 834 (Tex.App.--El Paso 2005, pet. denied). The burden then shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged in the motion. *Wade Oil & Gas*, 417 S.W.3d at 540. The trial court must grant the motion unless the non-movant produces summary judgment evidence raising a genuine issue of material fact. TEX.R.CIV.P. 166a(i).

A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard of review as we would for a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). Under this standard, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A genuine issue of material fact is raised if the non-movant produces more than a scintilla of evidence

5

regarding the challenged element. *King Ranch*, 118 S.W.3d at 751. More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *King Ranch,* 118 S.W.3d at 751. There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas,* 417 S.W.3d at 540. Evidence that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001); *Wade Oil & Gas*, 417 S.W.3d at 540.

Sandridge also asserted a traditional summary judgment under Tex.R.Civ.P. 166a(c).[2] Under a traditional motion, the moving party carries the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005); *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex.App.-- El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99. Once the movant establishes its right to summary judgment, the burden then shifts to the non-movant to present evidence which raises a genuine issue of material fact, thereby precluding summary judgment. *See City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979).

---

[2] In its hybrid motion, it is not entirely clear to us where the 166a(c) motion ends and the 166a(i) motion begins, or vice versa. But no objection was raised as to the manner in which Sandridge structured its motion, so it is not an issue before us. In analyzing the respective issues, we look first to see if Appellants produced any evidence to meet their burden in responding to the 166a(i) no evidence motion, and only secondarily review whether the 166a(c) motion has merit. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Fred Loya Ins. Agency, Inc. v. Cohen*, 446 S.W.3d 913, 918 (Tex.App.--El Paso 2014, pet. denied).

## RIGHT OF CONTROL AND VICARIOUS LIABILITY

The Houston Court of Appeals correctly noted that: "[d]rilling sites, of course, can be hazardous places. When injuries occur, it is often difficult to tell who is at fault due to the complex nature of the enterprise, . . . difficult questions regarding the right to control, and the intersection of premises liability and agency law in drilling operations." *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 168 (Tex.App.--Houston [14th Dist.], 2002, no pet.). And even though the accident here occurred off site, we are called upon to revisit the difficult questions of right of control and agency.

"Under Texas law, in the absence of a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so." *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex. 1993). One of the special relationships which might give rise to such a duty is when one contracting party controls the details of another contracting party's work. *Redinger v. Living, Inc*., 689 S.W.2d 415, 418 (Tex. 1985)(adopting RESTATEMENT (SECOND) OF TORTS § 414 (1977) which imposes a duty on a general contractor who retains the control of any part of the work over an independent contractor). Whether a contract gives one party the right to control another is generally a question of law. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). If a written contract creates a right to control, then the plaintiff need not prove an actual exercise of that control to establish a duty. *Dow Chemical Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999).

Even in the absence of an explicit contractual right of control, a plaintiff may also show that one contracting party actually exercised control over the manner in which another

7

contracting party performed its work. *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999). Whether one party exercised actual control is generally a fact issue. *Khan*, 138 S.W.3d at 292; *Lee Lewis*, 70 S.W.3d at 783.

However, the right to control must extend to the specific activity from which the injury arose. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998)(requiring "*nexus* between an employer's retained supervisory control and the condition or activity that caused the injury")[Emphasis in original]; *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997)("For the general contractor to be liable for negligence, its supervisory control must relate to the condition or activity that caused the injury."); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993)(requiring an inquiry into whether defendant had specific control over the safety and security of the premises, rather than allowing the fact finder to draw inference from defendant's more general control over operations); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911-12 (Tex.App.--Fort Worth 2009, pet. denied)("To trigger vicarious liability, . . . the right to control must extend to the specific activity from which the injury arose.").

Two cases highlight this principle. In *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469 (Tex. 1985)(per curiam), the court upheld a verdict finding that an oil company breached a duty of care to a drilling contractor's employee. The oil company failed to exercise its contractual right to suspend drilling operations when it became aware that the drilling contractor was violating a specific and critical safety provision found in the drilling contract. *Id*. at 470. Accordingly, the oil company's control extended to the specific injury causing event. *Id*. Conversely, in *Tirres v. El Paso Sand Products, Inc.*, 808 S.W.2d 672 (Tex.App.--El Paso, 1991, writ denied) this court

8

found the claimed indicia of control insufficient. There, El Paso Sand hired a trucker to move equipment and required the driver to use El Paso Sand's trailer. *Id*. at 674. The trucker was involved in an accident when the plaintiff collided with the trailer. *Id*. While El Paso Sand required the use of a specific trailer, and even obtained an oversize permit that restricted the dates when the trip might be taken, nothing about these actions dictated the manner in which the trucker operated his truck. *Id*. at 676.

Appellants argue that there is a fact issue both as to Sandridge's contractual and actual right of control. With regard to the contractual right of control, we agree in part with Appellants. The drilling contract here is a daywork drilling agreement. Generally, there are three types of land-based oil and gas drilling contracts: daywork, footage, and turnkey agreements. Owen L. Anderson, *The Anatomy of an Oil and Gas Drilling Contract,* 25 Tulsa L.J. 359, 374-380 (1990). In drilling contracts, the entity developing the well (such as Sandridge) is referred to as the "operator." The entity doing the driller (such as Amerimex) is referred to the "contractor." In a daywork contract, the operator pays the contractor a fixed price per day to drill the well and generally assumes the risks of the drilling operation except as expressly otherwise provided. *Id*. at 374. "Under the traditional daywork contract, the operator is in charge of directing the drilling operation. In other words, a daywork contract is similar to the contractor's lease of a rig, related equipment, and crew to the operator." *Id*. at 377. At the other end of the spectrum is the turnkey contract where the contractor assumes most of the risk and consequently controls all the details of the work. *Id*. at 378 ("In general, a drilling contractor assumes more risk under the turnkey contract than under the other types of contracts because the contractor has general control of all drilling operations."). The footage contract (a fixed price per foot of well drilled) falls somewhere in between, and some contracts are a blend of both. *Id*.

The Sandridge-Amerimex contract is based on the 2003 International Association of Drilling Contractor's form for daywork, and contains something of a contradiction in its opening paragraph. The contract provides that Sandridge hired Amerimex "as an independent contractor" on a "Daywork Basis." In the next sentence, however, it defines "Daywork Basis" to mean that Amerimex "shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day *under the direction, supervision and control*" of Sandridge, inclusive of any Sandridge's employees agent, consultant or subcontractor retained to "*direct drilling operations*." [Emphasis supplied.] The Anderson article describes this apparent contradiction in the 2003 International Association of Drilling Contractor form as a "cautious compromise" between a pure daywork arrangement and a turnkey contract. *Id.* at 375-76.

Delving a bit deeper into the contract reflects more of the compromise. There are several areas where Sandridge exerted specific control over the details of the work. Sandridge was responsible for preparing a casing and cementing program to prevent soil and subsoil wash out. It had the right to "designate the points at which casing will be set and the manner of setting, cementing and testing." But once specified, it could not materially change the casing program without Amerimex's consent. Sandridge had control over the drilling mud program for the project. Amerimex was responsible for the drilling equipment on the surface, but Sandridge assumed responsibility for the equipment once in the drilling hole. Amerimex was not required to push the rig beyond its operational limits and it had the final say on the capacity of the equipment. Both Sandridge and Amerimex were each to provide specific tools, equipment, and supplies for the project, all as set out in a detailed inventory form.

"An independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and methods without submitting to the

10

control of the other person as to the details of the work." *Farlow*, 284 S.W.3d at 911. A contract expressly providing that a person is an independent contractor is usually determinative of their status unless it is shown to be a mere sham or subterfuge, or other contract language evidences a different arrangement. *Id.* Even though this contract at one point claims Amerimex was an independent contractor, the actual terms of the contract reflects the opposite, at least for certain activities on the jobsite. This contract appears to us as a hybrid between the pure daywork and turnkey contract, giving Sandridge control over some aspects of the work at the site and Amerimex control over other aspects. *See Shamblin v. Chesapeake Energy Corp.*, No. 3:CV-12-089, 2014 WL 1796687, at *6 (M.D. Pa., Feb. 26, 2014.)(holding conflict in IADC daywork drilling contract defeated summary judgment based on independent contractor claim).

That conclusion, however, does not end our inquiry, because the case law has always required the control to relate to the injury causing activity. *Hoechst-Celanese*, 967 S.W.2d at 357; *Olivo*, 952 S.W.2d at 528; *Tidwell*, 867 S.W.2d at 23; *Tirres*, 808 S.W.2d at 676. In focusing just on the aspect of the agreement from which the injury arose--transportation of the workers--we do not find evidence in the summary judgment record that Sandridge retained any contractual right, or actually controlled, the manner in which the crew was transported to and from the work site.

First, the contract itself says nothing about transportation or housing of the crew, other than Sandridge was to pay Amerimex, who in turn could pay the driller, a $50 bonus for transporting the crew. Several courts have held that mere payment or reimbursement for transportation does not equate to control. *See Atlantic Indus., Inc. v. Blair*, 457 S.W.3d 511, 518 n.2 (Tex.App.--El Paso 2014, pet. filed)(monthly vehicle allowance was no evidence of control sufficient for negligent entrustment); *Wilson v. H.E. Butt Grocery Co.*, 758 S.W.2d 904, 907

11

(Tex.App.--Corpus Christi 1988, no writ)(reimbursement for mileage when employee driving home did not place worker in course and scope when employer had no control over means of transportation and route taken); *ACME Energy Services, Inc. v. Aranda*, 08-02-00205-CV, 2004 WL 868486, at *3 (Tex.App.--El Paso April 22, 2004, pet. denied)(mem. op.)(payment of $40 a day, even if termed as driving pay, would be at most temporary mileage compensation and does not place the employee in the course and scope of employment while traveling to and from work in the employee's automobile); *London v. Texas Power & Light Co.*, 620 S.W.2d 718, 720 (Tex.App.--Dallas 1981, no writ) (mileage compensation, paid by the employer, did not place the employee in the course and scope of employment while traveling to and from a temporary work site in the employee's automobile); *Pilgrim v. Fortune Drilling Co., Inc.*, 653 F.2d 982, 988 (5th Cir. 1981)(travel allowance paid to one member of drilling crew who drove 117 miles from drilling site not sufficient to establish respondeat superior liability). The contract here only provided for a bonus. It did not provide that Sandridge had the right to control the manner of transport, the route taken, or other details attendant to the task of driving.

Second, Appellants presented no evidence that Sandridge actually dictated control over the transportation of the workers, such as controlling the type of vehicle, the route taken, the driver's qualifications, when the workers would be transported, the vehicle speed, or any other factor which might relate to the occurrence of the accident. Instead, Appellants reason that by paying the bonus only to the crew's driller, J.C. Burchett, Sandridge controlled who would drive the crew. But the crew was not mandated to drive with the driller. The pay merely created an incentive for the crew to drive together. Nor was the crew driving together the cause of the injury producing event. At most, Sandridge had a say in the starting point and the ending point of the drive, but nothing in between. *See Limestone Products Distribution, Inc. v. McNamara*,

12

71 S.W.3d 308 (Tex. 2002)(company designation of delivery locations, and where pay tickets were to be dropped off related to the ends to be achieved, and not control of the details of work); *Eagle Trucking Co. v. Texas Bitulithic Co.*, 612 S.W.2d 503, 508 (Tex. 1981)(construction company was not liable for negligence of driver who hauled sand when company "had no more than the power to direct the place sand was to be loaded and the place it was to be unloaded.").[3] Accordingly, we overrule Issue One.

## EMPLOYMENT STATUS

In their second issue, Appellants alternatively contend that Burchett was an employee of Sandridge at the time of the accident, and that Sandridge was vicariously liable for his conduct.

The test to determine whether a worker is an employee is whether the claimed employer has the right to control the progress, details, and methods of the work. *Thompson v. Travelers Indem. Co.*, 789 S.W.2d 277, 278 (Tex. 1990); *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 585-90 (Tex. 1964). An employer controls not just the ends sought, but also controls the means and details of how to get to the end achieved. *Thompson,* 789 S.W.2d at 278; *Darensburg v. Tobey*, 887 S.W.2d 84, 88 (Tex.App.--Dallas 1994, writ denied); *Travelers Inc. Co. v. Ray*, 262 S.W.2d 801, 803 (Tex.Civ.App.--Eastland 1953, writ ref'd). The attributes of an employer include the

---

[3] We also note something of a disconnect between the pleadings below and the *Redinger* argument advanced on appeal. We read Appellants' Third Amended Petition to claim that Sandridge is vicariously liable for Burchett's conduct without regard to any specific act of negligence. The Third Amended Petition does not plead any specific act of Sandridge's negligence in how it exercised any control over Burchett. But proving control in a *Redinger* sense only allows Appellants to attempt to make a case that the control was negligently exercised, it does not create vicarious liability in and of itself. *See General Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008)("But one who retains a right to control the contractor's work may be held liable for negligence in exercising that right."); RESTATEMENT (SECOND) OF TORTS § 414 cmt a ("Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this section."). Appellant's response to the motion for summary judgment claims that there was no evidence as to the actual cause of the accident: "In point of fact, there is no evidence as to why Burchett collided with the vehicle he struck. Both Burchett and Steven Painter, the survivors of the collision, have no memory of the incident and the other two passengers were fatally injured. . . . So the actual cause of the incident is purely a matter of conjecture." Appellants Response to Mot. Summ. Judgment at ¶ VIII. But without knowing the cause of the accident, we fail to see how Appellants could ever link some specific failing in Sandridge's supposed control to the cause of the accident.

right to hire and fire, the obligation to pay wages and withhold taxes, the furnishing of tools, and most of all the power to control the details of the worker's performance. *See United States Fidelity and Guar. Co. v. Goodson,* 568 S.W.2d 443, 447 (Tex.Civ.App.--Texarkana 1978, writ ref'd n.r.e.).

In their Third Amended Petition, Appellants did not specifically claim that Burchett was Sandridge's employee, but instead more generally pleaded that he was their agent. Agency law could also impose vicarious liability on Sandridge if a true principal-agent relationship is adequately proven. *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276 (Tex. 2012). *Arvizu* refers to this as "non-employee mission liability." *Id*. In *Arvizu* an employee of one company was driving a car on a mission for the defendant company and it was conceded that the defendant company had the right to control the mission which was for its benefit. *Id.*. But just like an employer-employee relationship, non-employee mission liability requires proof that the principal has the right to control the details of the mission itself. *Id*.; *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence* PJC 10.10 (2014) ("On the occasion in question, was [J.C. Burchett] operating the vehicle in the furtherance of a mission for the benefit of [Sandridge] and subject to control by [Sandridge] as to the details of the mission?"). So whether termed as a claim of employee-employer or principal-agent, the inquiry is essentially the same in the context of this case.

And for the same reasons discussed above, we do not find evidence in the summary judgment record to support the claim that Burchett was Sandridge's employee (or principal), at least with respect to transporting the crew. Sandridge may have benefited from the end result of Burchett ferrying the crew back and forth from the worksite, but it did not control any details of the transportation, such as when he would leave and return, what kind of vehicle he would use,

14

how he would drive that vehicle, nor dictate the route to be taken. At least with respect to the transport of the crew, Burchett has all the makings of an independent contractor, and none of being Sandridge's employee or agent.

Even as an employee, Sandridge would not be vicariously responsible for Burchett's conduct unless the tortious act falls within the course and scope of his employment. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007); *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). Generally, an employee is not in the course and scope of employment while traveling to and from work. *Texas Gen. Indem. Co. v. Bottom*, 365 S.W.2d 350, 353 (Tex. 1963); *ACME Energy Services*, 2004 WL 868486, at *3; *Longoria v. Texaco, Inc.*, 649 S.W.2d 332, 335 (Tex.App.--Corpus Christi 1983, no writ); *London*, 620 S.W.2d at 720. An injury occurring while traveling to and from work generally arises from the risks and hazards inherent to the driving public, rather than a person's employment. *Smith v. Texas Employers' Ins. Assoc.,* 129 Tex. 573, 576, 105 S.W.2d 192, 193 (1937). And as a general rule, "an employer owes no duty to protect the public from the wrongful acts of its off-duty employees that are committed off the work site." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 405 (Tex. 2009); *Loram Maint. of Way, Inc.v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006).[4]

Recognizing this rule, Appellants suggest that several exceptions found in the Texas Labor Code place Burchett in the course and scope of employment. Under the Texas Worker's Compensation Act, a worker is in the "course and scope of employment" if performing "an activity of any kind or character that has to do with and originates in the work, business, trade, or

---

[4] A limited exception to this rule arises when the employer becomes aware of a worker's incapacity and then exercises control over the worker, such as the instance where an employer knew one of its employees was intoxicated and then effectively directed him to get in a vehicle and drive home. *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 308, 311 (Tex. 1983). Appellants raise no such claim here and there is no evidence in the record about Burchett's condition when he left the worksite.

profession of the employer and that is performed by an employee while engaged in or about the furtherance of the affairs or business of the employer." TEX.LAB.CODE ANN. § 401.011(12) (West 2015). But the Labor Code then excludes from that definition "transportation to and from the place of employment" unless:

  (i)  the transportation is furnished as a part of the contract of employment or is paid for by the employer;

  (ii)  the means of the transportation are under the control of the employer; or

  (iii)  the employee is directed in the employee's employment to proceed from one place to another place;

*Id*. at § 401.011 (12)(A)(i)(ii)(iii).

We first note that subdivisions (i), (ii), and (iii) are not a means to prove whether one is in the course and scope of employment, but are rather exceptions to the statutory exclusion for travel to and from work. *Zurich Am. Ins. Co. v. McVey*, 339 S.W.3d 724, 729 (Tex.App.--Austin 2011, pet. denied). One still must show that the travel "originates in the work, business, trade, or profession of the employer" and is done "in or about the furtherance of the affairs or business." *Id*. Additionally, the statutory provisions of the Labor Code do not dictate the outcome of this common law negligence case. The Worker's Compensation Act represents a statutorily imposed compromise between a worker and employer whereby a worker forfeits their right to sue the employer in exchange for certain, but more limited benefits. *Texas Workers' Compensation Com'n v. Garcia*, 893 S.W.2d 504, 511-12 (Tex. 1995). It is liberally construed in favor of the employee. *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000). The context of this suit, however, is an effort to impose vicarious liability on one party for the conduct of another; a concept which is generally a pure policy question of allocation of risk. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541 (Tex. 2002). The rules governing course and scope under the Labor Code,

16

and for vicarious liability under respondeat superior, can dictate different outcomes based on the same set of facts. *See Shelton v. Standard Ins. Co.*, 389 S.W.2d 290 (Tex. 1965)(upholding course and scope finding for worker traveling out of town in worker's compensation case, but noting in dicta that result would be different in respondeat superior context). While we might look to the statutory definitions of the Labor Code as persuasive authority, we do not view them as binding as to the issues in this suit.

For instance, under the Labor Code, transportation paid by the employer by itself negates the coming and going exclusion. TEX.LAB.CODE ANN. § 401.011(12)(A)(i). But for vicarious liability purposes, payment for transportation is not sufficient evidence supporting respondeat superior status. *Wilson*, 758 S.W.2d at 907; *ACME Energy Services,* 2004 WL 868486, at *3; *London*, 620 S.W.2d at 720; *Pilgrim*, 653 F.2d at 988. Under the Labor Code, an employee on a special mission, at the direction of the employer, also negates the coming and going exclusion. TEX.LAB.CODE ANN. § 401.011(12)(A)(iii); *American Gen. Ins. Co. v. Coleman,* 157 Tex. 377, 303 S.W.2d 370, 374 (1957). But for respondeat superior purposes, the case law requires control, such as control over the route taken. *See Smith v. Universal Elec. Const. Co.*, 30 S.W.3d 435, 440 (Tex.App.--Tyler 2000, no pet.); *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 636 (Tex.App.--San Antonio 1993, no pet.); *Wilson*, 758 S.W.2d at 907; *London*, 620 S.W.2d at 720. Finding no evidence of such control on the summary judgment record before us, we overrule Issue Two.

### BORROWED SERVANT

In Issue Three, Appellants alternatively contend that Burchett was Sandridge's borrowed servant. The general employee of one employer may become the borrowed servant of another. *Sparger v. Worley Hospital, Inc.*, 547 S.W.2d 582, 583 (Tex. 1977); *Producers Chemical*

17

*Company v. McKay*, 366 S.W.2d 220, 225 (Tex. 1963). The test for borrowed servant is whether "the other employer or its agents have the right to direct and control the employee with respect to the details of the particular work at issue." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002). This test brings us squarely back to the same problem Appellants face with Issues One and Two: there is no evidence in the summary judgment record showing that Sandridge had any control over the details of how Burchett transported Amerimex's other employees. Mere payment of a bonus that was passed through to Burchett does not equate to control over the details of the work. Nor does merely designating the location of a bunkhouse, which the employees were not required to stay at, create the level of control which would justify imposing vicarious liability on Sandridge for the act of another contractor's employee. We overrule Issue Three, and affirm the judgment below.

November 3, 2015
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, J., and Chew, C.J. (Senior)
Chew, C.J. (Senior), sitting by assignment
Chew, C.J. (Senior), dissenting without opinion

18