**Reversed and Rendered, and Opinion Filed August 25, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01042-CV

### TEXAS INSTRUMENTS, INC., Appellant
### V.
### ALESSANDRO UDELL, Appellee

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-03191**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Richter[1]
Opinion by Justice Lang

In this case, we must determine whether an injured worker's remedy to seek compensation is exclusively under workers' compensation or pursuant to a common-law negligence claim. Before us, Texas Instruments, Inc. (TI) brings an appeal of the trial court's second amended final judgment awarding Alessandro Udell damages in the amount of $468,972 on his negligence claim based on an injury Udell sustained while assigned by Volt Services Group to work at TI. In seven issues, TI argues, the trial court erred when it denied TI's: (1) motions for directed verdict and judgment notwithstanding the verdict because the Texas Workers' Compensation Act is the exclusive remedy available to Udell; (2) motion for judgment notwithstanding the verdict on the jury's answer to question no. 3, finding that Udell was not

---

[1] The Hon. Martin Richter, Justice, Assigned

acting as an employee of TI at the time of the injury; (3) motions for directed verdict and judgment notwithstanding the verdict because the evidence was legally insufficient to support the jury's answer to question no. 1, finding TI negligent; (4) motion for new trial because the evidence was factually insufficient to support the jury's answer to question number 1, finding that TI was negligent; (5) objection to the jury charge on the basis that it should include a question on Udell's negligence; (6) challenge for cause against a prospective juror; and (7) motions for judgment notwithstanding the verdict and new trial because the evidence was legally and factually insufficient to support the jury's answer to question no. 2, awarding Udell damages.

Udell filed a cross appeal. In one cross-issue, Udell argues the trial court erred when it granted TI's motion for judgment notwithstanding the verdict, disregarding the jury's award of a total of $150,000 in damages for Udell's past and future mental anguish.

We conclude the trial court erred when it denied TI's motions for directed verdict and judgment notwithstanding the verdict because the Texas Workers' Compensation Act was the exclusive remedy available to Udell. The trial court's second amended final judgment is reversed and judgment is rendered in favor of TI on its affirmative defense under section 408.001 of the Texas Workers' Compensation Act.

## I. FACTUAL AND PROCEDURAL CONTEXT

TI and Volt executed a contract for Volt to furnish personnel with specific work qualifications and skills as requested by TI from time-to-time. Udell was hired by Volt and assigned to work at TI.

Udell worked as a manufacturing specialist in a TI facility that was involved in the manufacture of semiconductors. Keith Davis, the TI supervisor for Udell, other Volt contractors, and some TI employees, set the work schedule and hours, determined overtime and approved

time off. Also Davis and Anthu Tran, the TI team lead for Udell's group, made the work assignments for the people working on their team, including Udell. Tran also assigned Udell to training.

At the TI facility, Udell worked in a "clean room," which had laminar air flow, which is flow that comes from above, and holes and grates in a raised floor so that air can pass through the room and down through the floor to trap any dust and debris, keeping particles from staying stationary or floating in the air. On March 23, 2010, Udell's tasks were assigned by Tran. As part of his assigned tasks, Udell carried "pods" to a work area and loaded them onto a machine. As he walked to the next tool, to perform assigned tasks, he tripped and was injured. Udell received treatment and reported his injury. Davis investigated and discovered that Udell tripped where the corner of a floor tile was slightly raised. Udell had five surgeries after his accident at TI and received workers' compensation benefits through Volt's insurance carrier.

Udell filed suit against TI for negligence based on the injury Udell sustained while assigned to work at TI by Volt. TI answered generally denying the claim and asserted, in part, that Udell's claims were barred by section 408.001 of the Texas Workers' Compensation Act, the exclusive remedy provision. *See* TEX. LAB. CODE ANN. §§ 401.001, 408.001 (West 2015). TI filed a motion for traditional summary judgment on its affirmative defense based on the exclusive remedy, which the trial court denied. Then, TI filed a motion based on Texas Rule of Civil Procedure 248, alleging that, as a matter of law, the trial court should determine whether Udell was an employee of TI for purposes of workers' compensation. TI argued that if Udell was its employee, then his claim was barred by the exclusive remedy provision. The trial court denied TI's motion.

The case was tried to a jury. At the conclusion of the evidence, TI moved for a directed verdict based, in part, on the exclusive remedy provision, which the trial court denied. The jury

found in favor of Udell on his negligence claim, that he was not acting as an employee of TI at the time of the accident, and awarded him the following damages: $100,000 in past physical pain and suffering; (2) $200,000 in future physical pain and suffering; (3) $100,000 in past mental anguish; (4) $50,000 in future mental anguish; (5) $125,000 in past physical impairment; (6) $25,000 in future physical impairment; (7) $5,000 in past disfigurement; (7) $1,000 in future disfigurement; and (8) $12,972 in past loss of earning capacity. The trial court signed a final judgment incorporating the jury's verdict and awarding damages in the amount of $618,972.

TI filed a motion for judgment notwithstanding the verdict. The trial court granted the motion, in part, disregarding the jury's answers to question 2 that awarded Udell past and future mental anguish. The remainder of the motion was denied. As a result, the trial court signed the second amended final judgment, which reduced Udell's damages to $468,972. Also, TI filed a motion for new trial, which was overruled by operation of law.

## II. TEXAS WORKERS' COMPENSATION ACT

In issues one and two, TI argues the trial court erred when it: (1) denied TI's motions for directed verdict and judgment notwithstanding the verdict because the Texas Workers' Compensation Act is the exclusive remedy available to Udell; and (2) denied TI's motion for judgment notwithstanding the verdict on the jury's answer to question no. 3, finding that "[a]t the time of the occurrence in question, [] Udell [was not] acting as an employee of [TI]."[2] In its brief on appeal, TI combines two arguments that we construe to be alternative arguments, claiming: (1) Udell was its employee; or (2) it was Udell's statutory employer.

---

[2] In the "Summary of the Argument" section of TI's brief on appeal, it appears that TI is also appealing the trial court's denial of its motion for traditional summary judgment on its affirmative defense asserting the exclusive remedy provision of the Texas Workers' Compensation Act. However, after a trial on the merits, the denial of a motion for summary judgment may not be reviewed on appeal, except in specific situations that do not apply here. *See Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 724 (Tex. App.—Dallas 2015, no pet.); *Anderton v. Schindler*, 154 S.W.3d 928, 931 (Tex. App.—Dallas 2005, no pet.).

First, TI argues Udell was its employee because: (1) although the contract states Volt is an independent contractor, the substance of the contract shows that Volt was not an independent contractor, but a staffing agency; (2) the substance of the contract and the evidence conclusively show that TI exercised actual control over the details of Udell's work; and (3) the evidence conclusively shows that TI had workers' compensation insurance. Udell responds that he was not an employee of TI because: (1) as a matter of law, Volt is an independent contractor based on the contract's express statement to that effect and Volt controlled the manner and means of Udell's work; (2) the evidence is legally sufficient to support the jury's finding that "[a]t the time of the occurrence [] . . . Udell [was not] acting as an employee of TI"; and (3) the evidence did not conclusively show that TI carried workers' compensation insurance that would cover Udell.

Second, TI argues that Udell should be treated as its employee for workers' compensation purposes because: "(1) Udell was a [']statutory employee['] of TI[;] and (2) TI was covered by a workers' compensation policy." Specifically, TI argues "[t]he evidence conclusively established both that Udell was TI's [']statutory employee['] under the T[exas] W[orkers'] C[ompensation] A[ct] and that TI maintained workers' compensation insurance at the time of Udell's accident." Udell does not respond to this argument on appeal.

### A. *Standards of Review*

### 1. Motion for Directed Verdict

A directed verdict is warranted when the evidence is such that no other verdict can be reached and the moving party is entitled to judgment as a matter of law. *See Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 645 (Tex. App.—Dallas 2015, no pet.); *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 619 (Tex. App.—Dallas 2010, no pet.); *Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.—Dallas 2006, no pet.). A directed verdict for a defendant may be proper in three situations: (1) when a plaintiff fails to present

–5–

evidence raising a fact issue essential to the plaintiff's right of recovery; (2) if the plaintiff either admits or the evidence conclusively establishes a defense to the plaintiff's cause of action; or (3) a legal principle precludes recovery. *See Prudential Ins. v. Fin. Review Servs.*, 29 S.W.3d 74, 77 (Tex. 2000); *Blackstone*, 470 S.W.3d at 645; *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 398 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (noting directed verdict also proper when legal principle precludes recovery); *see also Cambio v. Briers*, No. 01-10-00807-CV, 2015 WL 2229274, at *3 (Tex. App.—Houston [1st Dist.] May 12, 2015, no pet.) (mem. op.) (noting directed verdict also proper when legal principle precludes recovery).

To the extent that a trial court's denial of a directed verdict is based on the evidence, the standard of review is a legal sufficiency or "no evidence" standard of review. *See Blackstone*, 470 S.W.3d at 645; *Mauricio v. Castro*, 287 S.W.3d 476, 478–79 (Tex. App.—Dallas 2009, no pet.). Similarly, when reviewing a trial court's order granting a directed verdict, an appellate court also follows the standard of review for assessing the legal sufficiency of the evidence. *See Flagstar Bank, FSB v. Walker*, 451 S.W.3d 490, 498 (Tex. App.—Dallas 2014, no pet.). When reviewing a directed verdict, an appellate court considers all the evidence in a light most favorable to the nonmovant, and resolves all reasonable inferences that arise from the evidence admitted at the trial in the nonmonvant's favor. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003); *Blackstone*, 470 S.W.3d at 645; *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 594 (Tex. App.—Dallas 2015, pet. denied). If a fact issue is raised on a material question, a directed verdict is not proper and the issue must go to the jury. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 220–21 (Tex. 2011); *Blackstone*, 470 S.W.3d at 645.

To the extent that the trial court's ruling on a directed verdict is based on a question of law, an appellate court reviews that aspect of the ruling de novo. *See JSC Neftegas-Impex*, 365 S.W.3d at 398; *see also Cambio*, 2015 WL 2229274, at *3.

## 2. Motion for Judgment Notwithstanding the Verdict

A trial court should grant a motion for judgment notwithstanding the verdict when: (1) the evidence is conclusive and one party is entitled to recover as a matter of law; or (2) a legal principle precludes recovery. *See Blackstone*, 470 S.W.3d at 645; *Iroh v. Igwe*, 461 S.W.3d 253, 261 (Tex. App.—Dallas 2015, pet. denied); *see also* TEX. R. CIV. P. 301. A judgment notwithstanding the verdict is proper when a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *Blackstone*, 470 S.W.3d at 645; *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cty., Inc.*, 393 S.W.3d 492, 515 (Tex. App.—Dallas 2013, pet. denied). Also, the standard of review for the denial of a motion for judgment notwithstanding the verdict is the same as for the denial of a motion for directed verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review"); *Blackstone*, 470 S.W.3d at 645–46; *Iroh*, 461 S.W.3d at 261 n.3; *Cambio*, 2015 WL 2229274, at *3 (judgment notwithstanding the verdict also proper when legal principle precludes recovery, which is reviewed de novo); *JSC Neftegas-Impex*, 365 S.W.3d at 398.

### B. Applicable Law

### 1. Texas Workers' Compensation Act—Standard of Review

Courts construe the Texas Workers' Compensation Act liberally in favor of coverage as a means of affording employees the protections the Texas Legislature intended. *See Port Elevator-Brownsville v. Casados*, 358 S.W.3d 238, 241 (Tex. 2012). The Texas Workers' Compensation Act has a "decided bias" for coverage and courts interpret the statute in a way that favors blanket coverage to all workers on a site. *See TIC Energy & Chem., Inc. v. Martin*, No. 15-0143, 2016 WL 3136877, at *5 (Tex. June 3, 2016); *Entergy Gulf States, Inc. v. Summers*,

282 S.W.3d 433, 451 (Tex. 2009); *HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 359 (Tex. 2009); *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 140 (Tex. 2003). An appellate court applies the Texas Workers' Compensation Act as written when determining workers' compensation issues. *See Wingfoot*, 111 S.W.3d at 139.

### 2. Texas Workers' Compensation Act—Generally

Unlike workers' compensation laws in other states, the Texas Workers' Compensation Act permits private Texas employers to choose whether to subscribe to workers' compensation insurance. *See* TEX. LAB. CODE ANN. § 406.002(a) (West 2015); *Port Elevator*, 358 S.W.3d at 241. The Texas Legislature intended the Texas Workers' Compensation Act to benefit both employees and subscribing employers. *See TIC Energy*, 2016 WL 3136877, at *3; *Port Elevator*, 358 S.W.3d at 241.

For employees, the Texas Workers' Compensation Act allows them to recover workers' compensation benefits for injuries in the course and scope of their employment without proving fault by the employer and without regard to their negligence or that of their coworkers. *See* TEX. LAB. CODE ANN. § 406.031 (West 2015); *Port Elevator*, 358 S.W.3d at 241. It also guarantees prompt payment of medical bills and lost wages to covered employees sustaining work-related injuries without the time, expense, and uncertainty of proving liability under common-law theories. *See TIC Energy*, 2016 WL 3136877, at *3.

As for the benefit to employers, it limits their liability. *See Port Elevator*, 358 S.W.3d at 241. In particular, the Texas Workers' Compensation Act prohibits employees from seeking common-law remedies from their employers by making workers' compensation benefits an injured employee's exclusive remedy. *See* TEX. LAB. CODE ANN. § 408.001(a) (West 2015); *TIC Energy*, 2016 WL 3136877, at *3; *Port Elevator*, 358 S.W.3d at 241. The exclusive remedy provision is an affirmative defense that the defendant must plead and prove. *See Warnke v.*

*Neighbors Drilling USA, L.P.*, 358 S.W.3d 338, 343 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Employees may have more than one employer within the meaning of the Texas Workers' Compensation Act, and each employer who subscribes to workers' compensation insurance may raise the exclusive-remedy provision as a bar to claims about an injury. *See Port Elevator*, 358 S.W.3d at 242.

### 3. Texas Workers' Compensation Act—Employers and Employees

The Texas Workers' Compensation Act defines the terms "employer" and "employee" in different ways depending on the context. *See TIC Energy*, 2016 WL 3136877, at \*8. *Compare, e.g.,* TEX. LAB. CODE ANN. §§ 401.011(8) (general definition of employer), 401.012 (general definition of employee) *with* TEX. LAB. CODE ANN. §§ 406.001 (definition of employer for purposes of workers' compensation coverage), 406.122 (definition of employee for purposes of workers' compensation insurance coverage). For purposes of workers' compensation coverage, "employer" means "a person who employs one or more employees." TEX. LAB. CODE ANN. § 406.001 (West 2015).

Section 406.122 of the Texas Workers' Compensation Act states a general rule of employment status for workers' compensation purposes. *See TIC Energy*, 2016 WL 3136877, at \*6. It "provides the applicable definition of employee with respect to the terms 'subcontractor' and 'independent contractor.'" *See TIC Energy*, 2016 WL 3136877, at \*8. A "general contractor" means "a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors." TEX. LAB. CODE ANN. § 406.121(a) (West 2015). Section 406.121(5) defines a "subcontractor" as "a person who contracts with a general contractor to perform all or part of the work or services that the general contractor has undertaken to perform." TEX. LAB. CODE ANN. § 406.121(5). An "employee" means "a person who performs work or provides a service for a general contractor . . . who is an employer under

[section 406.001] is an employee of that general contractor . . . unless the person is [an independent contractor or the employee of an independent contractor]." TEX. LAB. CODE ANN. § 406.122(a) (West 2015). In other words, section 406.122(a) deems all persons providing work or services for a general contractor to be employees of the general contractor, except for independent contractors and their employees. *See* TEX. LAB. CODE ANN. § 406.122(a); *TIC Energy*, 2016 WL 3136877, at 4.

### a. Independent Contractors and Their Employees Excluded

Section 406.121(2) defines an "independent contractor" as:

[A] person who contracts to perform work or provide a service for the benefit of another who ordinarily:

(A)     acts as the employer of any employee of the contractor by paying wages, directing activities, and performing other similar functions characteristic of an employer-employee relationship;

(B)     is free to determine the manner in which the work or service is performed, including the hours of labor of or method of payment to any employee;

(C)     is required to furnish or to have employees, if any, furnish necessary tools, supplies, or materials to perform the work or service; and

(D)     possesses the skills required for the specific work or service.

TEX. LAB. CODE ANN. § 406.121(2). Under section 406.122(b), a subcontractor is not an "employee" of the general contractor if the subcontractor: (1) is operating as an "independent contractor"; and (2) has agreed in writing to assume the responsibilities of an employer for the performance of the work. *See* TEX. LAB. CODE ANN. § 406.122(b); *TIC Energy*, 2016 WL 3136877, at *1. In other words, section 406.122(b) affirmatively excludes subcontractors as the general contractor's employees if they are operating as an independent contractor and have a written agreement evidencing that relationship. *See* TEX. LAB. CODE ANN. § 406.122(b); *TIC Energy*, 2016 WL 3136877, at *6.

–10–

**b. Determining Whether a Worker is an Employee or an Independent Contractor**

A contract expressly providing that a person is an independent contractor is usually determinative of their status, unless: (1) it is shown to be a mere sham or subterfuge; or (2) other contract language evidences a different arrangement. *See Painter v. Sandridge Energy, Inc.*, No. 08-13-00272-CV, 2015 WL 6704759, at *5 (Tex. App.—El Paso Nov. 3, 2015, pet. denied); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Newspaper, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964)). However, a contract between two employers providing that one shall have the right to control certain activities is a factor to be considered, but it is not controlling. *See Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 (Tex. 1992) (discussing borrowed servant doctrine); *Draper v. Am. Rice, Inc.*, No. 01-09-00239-CV, 2010 WL 2991094, at *5 (Tex. App.—Houston [1st Dist.] July 29, 2010, no pet.) (mem. op.) (borrowed servant); *Flores v. N. Am. Tech. Group, Inc.*, 176 S.W.3d 442, 449 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (borrowed servant). Whether a contract gives the right to control is generally a question of law. *See Farlow*, 284 S.W.3d at 911.

Even in the absence of an explicit contractual right to control, a party to a contract may show that one contracting party actually exercised control over the manner in which another contracting party performed its work. *See Painter*, 2015 WL 6704759, at *4. The test for distinguishing between an employee and an independent contractor focuses on whether the "employer" has the right to control the progress, details, and methods of operation of the work. *See Painter*, 2015 WL 6704759, at *6; *Raynor v. Moores Mach. Shop, L.L.C.*, 359 S.W.3d 905, 908 (Tex. App.—Houston [14th Dist.] 2010, no pet.). An employer controls not just the ends sought, but the means and details of how to get to the end achieved. *See Painter*, 2015 WL 6704759, at *6. The right to control is measured by considering the following attributes of an employer: (1) the independent nature of the workers' business; (2) the right to hire and fire; (3)

the obligation to pay wages and withhold taxes and the method of payment, whether by unit of time or by the job; (4) the worker's obligation to furnish necessary tools and supplies; (5) the time for which the worker is employed; and (6) the employer's actual control of the progress of the work and the details of the worker's performance, not just the ends sought or the final results. *See Painter*, 2015 WL 6704759, at *6 (listing four factors); *Raynor*, 359 S.W.3d at 908 (listing five factors). For workers' compensation purposes, actual control over the details of an employee's work that gave rise to the injury exists if the employee was working on the general contractor's premises, in furtherance of its day-to-day business, and the details of that work were specifically directed by the general contractor. *See Garza v. Excel Logistics, Inc.*, 161 S.W.3d 473, 477 (Tex. 2005).

Whether one party exercised actual control is generally a fact issue. *See Painter*, 2015 WL 6704759, at *4; *Farlow*, 284 S.W.3d at 911. Similarly, determining employee status is a fact question for the jury, unless the material, underlying facts are not in dispute and can give rise to only one reasonable conclusion. *See Raynor*, 350 S.W.3d at 980–09.

#### 4. Texas Workers' Compensation Act—Statutory Employer Exception

However, an exception to the general rule in section 406.122(a), excluding the employees of "independent contractors" from the definition of "employee," exists when a "general contractor" is: (1) the statutory employer of the independent contractor; and (2) the general contractor is covered by a workers' compensation policy. *See Port Elevator*, 358 S.W.3d at 243; *W. Steel Co. v. Altenburg*, 206 S.W.3d 121, 123 (Tex. 2006). A general contractor may become a statutory employer of an independent contractor in at least two ways. First, a general contractor may become a voluntary statutory employer under section 406.123(a) by agreeing, in writing, to provide workers' compensation insurance to the independent contractor. *See* TEX. LAB. CODE ANN. § 406.122(a); *TIC Energy*, 2016 WL 3136877, at 4; *Entergy*, 282 S.W.3d at 439

(discussing voluntary employer status). Second, a general contractor may become the statutory employer of an independent contractor's employee under the "deemed employer" provision in section 406.124. *See Entergy*, 282 S.W.3d at 438–39; *Houston Fire & Cas. Ins. v. Farm Air Serv., Inc.*, 325 S.W.2d 860, 864–65 (Tex. Civ. App.—Austin 1959, writ ref'd n.r.e.) (concluded that earlier version of section 406.124 included independent subcontractor).

Section 406.124 addresses when a subscriber to workers' compensation shall be a "deemed employer" and the worker shall be "treated as an employee." Essentially, if the worker is an "employee" under some other statutory provision, then section 406.124 does not apply. *See All-Tex Roofing, Inc. v. Greenwood Ins. Group, Inc.*, 73 S.W.3d 412, 419 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (noting that if worker had been proved to have been All-Tex's employee, there would have been no need to invoke section 406.124 in order to "treat" him as one). Section 406.124 provides:

> If a person who has workers' compensation insurance coverage subcontracts all or part of the work to be performed by the person to a subcontractor with the intent to avoid liability as an employer under this subtitle, an employee of the subcontractor who sustains a compensable injury in the course and scope of the employment shall be treated as an employee of the person for purposes of workers' compensation . . . .

TEX. LAB. CODE ANN. § 406.124 (West 2015). It has long been the policy of Texas that no subscriber to workers' compensation insurance can avoid covering an injured worker merely because the worker was employed by a subcontractor. *See Entergy*, 282 S.W.3d at 438 n.5. There is "no distinction between different kinds of entities up and down the contracting chain." *See Entergy*, 282 S.W.3d at 439. For purposes of the Texas Workers Compensation Act, "it would be [] bad for owner-subscribers[,] [general contractors, subcontractors, or any other subscriber,] to try to avoid covering workers by subcontracting out the work." *See Entergy*, 282 S.W.3d at 439. "By operation of [section 406.124], a [person who has workers' compensation insurance coverage] who contracted out work to avoid liability for its workers' injuries would

–13–

nevertheless be considered the employer, the injured worker would be entitled to benefits under the [deemed employer's] compensation policy, and the [deemed employer] would be entitled to the exclusive remedy defense." *See Entergy*, 282 S.W.3d at 439.

### 5. Workers' Compensation Insurance Coverage

Section 406.002 of the Texas Workers' Compensation Act provides that "an employer may elect to obtain workers' compensation insurance coverage" and if it does so, it is subject to the Act. *See* TEX. LAB. CODE ANN. § 406.002; *Garza*, 161 S.W.3d at 478. The methods for obtaining coverage are specified in section 406.003, which provides that "[a]n employer may obtain workers' compensation insurance coverage through a licensed insurance company or through self-insurance." *See* TEX. LAB. CODE ANN. § 406.002; *Garza*, 161 S.W.3d at 478. Section 406.051 provides that "[a]n insurance company may contract to secure an employer's liability and obligations and to pay compensation by issuing a workers' compensation insurance policy," and "[t]he contract for coverage must be written on a policy and endorsements approved by the Texas Department of Insurance." *See* TEX. LAB. CODE ANN. § 406.051(a), (b); *Garza*, 161 S.W.3d at 478.

When the worker agrees that the general contractor has workers' compensation insurance, there is no dispute that the general contractor is a subscriber. *See W. Steel*, 206 S.W.3d at 124. "[T]he T[exas] W[orkers'] C[ompensation] A[ct] and [the] decisions [of the Texas Supreme Court] are intended to prevent an employer from splitting its workforce by choosing coverage for some employees but not coverage for all—absent limited statutory or common-law exceptions." *See Port Elevator*, 358 S.W.3d at 243. As a result, if the general contractor is the worker's employer, it is enough to show that it is a workers' compensation subscriber. *See Port Elevator*, 358 S.W.3d at 243 (noting parties agreed that Port Elevator was workers' compensation subscriber at time of injury and no evidence of exception to rule against splitting workforce).

## C. Application of the Law to the Facts

TI raises two alternative arguments on appeal, contending: (1) Udell was its employee; or (2) it was Udell's statutory employer. As a result, the resolution of this issue depends on whether TI was: (1) Udell's employer and covered by workers' compensation insurance coverage; (2) his employer and not covered by workers' compensation insurance; (3) not his employer, but his statutory or "deemed employer," and covered by workers' compensation insurance; or (4) not his employer. *See generally, Garza*, 161 S.W.3d at 475.

### 1. Was Udell an Employee of TI for Purposes of Workers' Compensation?

Initially, we address TI's argument that Udell was its employee. The parties focus on three major questions that we must resolve: (1) whether Volt was an independent contractor pursuant to the terms of the contract between TI and Volt; (2) whether TI had the right to control the progress, details, and methods of operations of Udell's work; and (3) whether TI had workers' compensation insurance. An answer in favor of Udell on any of these questions results in the conclusion that Udell was not an employee of TI for purposes of workers' compensation and ends our inquiry. Accordingly, we address each argument in turn.

### a. Was Volt an Independent Contractor Pursuant to the Terms of the Contract?

Initially, we address the parties' first major area of analysis, which requires us to determine whether Volt was an independent contractor pursuant to the terms of the contract between TI and Volt. If it was, then pursuant to section 406.122(b), Udell was excluded from being an employee of TI for purposes of workers' compensation coverage. *See* TEX. LAB. CODE ANN. § 406.122(b). This analysis requires us to examine the contract between TI and Volt. Although TI acknowledges that the contract recites that Volt is an independent contractor, it argues that recitation is not controlling. Also, TI claims the contract between it and Volt is silent

–15–

as to who controls the day-to-day activities of individual workers. Conversely, Udell argues "the contract expressly states that Volt, not TI, controlled the manner and means of Udell's work."

At trial, the contract between TI and Volt, was admitted into evidence. It consists of the main contract and an attachment, describing the professional services that Volt will provide to TI. Initially, the contract appears to provide that Volt is an independent contractor because paragraph 11 of the contract between TI and Volt is titled "Independent Contractor" and states "It is understood and agreed that Volt shall be acting as an independent contractor and not as an agent or employee of TI." A contract expressly providing that a person is an independent contractor is usually determinative of their status, unless: (1) it is shown to be a mere sham or subterfuge; or (2) other contract language evidences a different arrangement. *See Painter*, 2015 WL 6704759, at *5. Neither party argues the contract was a mere sham, so we must look to see whether other contract language evidences a different relationship. *See Painter*, 2015 WL 6704759, at *5.

The contract provides that TI will pay Volt for the services of its contract personnel, and Volt will be responsible for the environmental, safety, health, information access, and security training. In addition, the attachment to the contract requires Volt to provide on-site program managers to manage the contract personnel, including their training, scheduling and vacation requests, and testing. However, paragraph 5(a) provides that TI "reserves the right to accept or reject any of Volt's personnel submitted for assignments . . . at its sole discretion." Also, paragraph 2(C) of the contract discusses, in part, qualified Volt candidates attending "TI's new hire orientation." Further, pursuant to paragraph 7, upon notification to Volt that TI has determined that any of Volt's personnel are not qualified or are incapable to perform the duties, TI is not required to pay for the services of the identified personnel. Also, paragraph 20(a) provides that if Volt's employees fail to act in a businesslike manner or interfere with TI

business operations, it shall be grounds for immediate termination of the contractor's badge, which may be issued to Volt personnel at TI's discretion. In addition, the attachment to the contract between TI and Volt states that TI shall provide "appropriate style smocks, gloves, and other related equipment," "shall reimburse Volt for the actual costs of Volt-provided eye exams and prescription safety glasses," "shall provide wafer carriers and wafers to allow applicants to gain experience in material handling as a part of the . . . program," and "shall provide access to web[-]based testing materials."

Even though the contract claims Volt is an independent contractor, the terms of the contract referred to above reflect that TI retained control over, at least, certain activities. Accordingly, the contract between TI and Volt appears to be a "hybrid agreement." *See generally, Painter*, 2015 WL 6704759, at *5 (discussing pure daywork and turnkey contracts). As a result, we conclude the contract does not control or end our inquiry into whether Udell was TI's employee for purposes of workers' compensation. *See generally, Exxon Corp.*, 842 S.W.2d at 630 (contract between two employers providing one employer has right to control certain activities is factor to consider, but not controlling); *Painter*, 2015 WL 6704759, at *5.

### b. Did TI Have the Right to Control Udell's Work?

Next, we address the parties' second major area of analysis, which requires us to determine whether Udell was an "employee" of TI for purposes of workers' compensation coverage, not an independent contractor, because TI had the right to control the progress, details, and methods of operation of Udell's work that gave rise to his injury. *See Painter*, 2015 WL 670459, at *6; *Raynor*, 359 S.W.3d at 908. TI argues it is undisputed that Udell was working on its premises at the time of the accident and Udell was furthering TI's day-to-day business at the time of his injury. According to TI, the only dispute is whether it was directing the details of Udell's work at the time. TI claims the evidence conclusively established that Udell was its

employee because it shows: (1) Udell had just completed carrying and loading some "pods" onto a TI machine and was walking to another tool when he tripped over a floor tile; (2) TI made the assignments as to which tool Udell would work on for a given day; and (3) TI's personnel provided the training that was required for Udell to work with those tools. Udell responds that the evidence shows Udell was the employee of Volt, an independent contractor, not TI's employee for purposes of workers' compensation because "it is clear that Volt was Udell's employer and no implied contract was entered into between Udell and TI. Volt clearly had control over Udell's employment."

As a preliminary matter, we note that Udell's argument on appeal suggests that he can have only one employer and that his employer was Volt. However, an employee may have more than one employer within the meaning of the Texas Workers' Compensation Act. *See Port Elevator*, 358 S.W.3d at 242. TI does not dispute that Volt was Udell's employer. Rather, it argues that for purposes of workers' compensation insurance coverage, Udell was also TI's employee. Accordingly, we examine the record to see whether TI had the right to control the progress, details, and methods of operation of Udell's work at the time of his injury. *See Painter*, 2015 WL 6704759, at *5 (law has always required control to relate to injury causing activity). Udell does not point us to any authority demonstrating that evidence showing Volt was Udell's employer negates the evidence demonstrating that Udell was also TI's employee for purposes of workers' compensation. *See Garza*, 161 S.W.3d at 477 (testimony that supervisors for both client company and temporary employment agency told injured worker what to do on a day-to-day basis and it was client company's supervisor that directed the work related to the injury was sufficient for summary judgment purposes to establish client company actually controlled details of work that causes injury).

–18–

In order to determine whether TI had the right to control Udell's work at the time of his injury, we consider the following: (1) the independent nature of Volt's and Udell's business; (2) whether TI or Volt had the right to hire and fire Udell; (3) whether TI or Volt had the obligation to pay wages and withhold taxes, and whether the method of Udell's payment was by unit of time or by job; (4) Udell's obligation to furnish necessary tools and supplies; (5) the time for which Udell was employed; and (6) TI's actual control of the progress of Udell's work and the details of his performance, not just the ends sought or the final result. *See Painter*, 2015 WL 6704759, at *6; *Raynor*, 359 S.W.3d at 908. We address each of these contentions in turn.

First, with respect to the independent nature of the Volt's or Udell's business, the record shows that in the TI clean room, TI and Volt employees worked together, "side-by-side," and the only way to tell them apart was by their badge. According to Davis, although the Volt workers wore a different badge, they were treated the same as the TI employees and he used the same process for setting their work hours. Further, the contract between TI and Volt required that all Volt employees assigned to work at TI "execute all forms that TI may request of its own employees," which included drug testing certification. Also, the contract required that Volt personnel "successfully complete a drug test prior to performing work on TI property." According to Davis, all of TI's policies applied to all workers. This is consistent with the contract between TI and Volt, which required Volt to comply with and ensure its employees complied with TI's environmental, health and safety, and information access and related training "procedures, specifications, standards, guidelines and handbooks." *Cf. Raynor*, 359 S.W.3d at 910 (concluding, in part, there was a fact issue as to the independent nature of the workers' business because there was evidence that company did not treat worker the same way it treated its employees, did not require worker to complete employment application and paperwork that its

–19–

employees had to complete, did not require worker to take a drug test like its employees, and worker was hired to perform a specific task that was not part of company's core business).

Second, as to the right to hire and terminate employees, the contract between TI and Volt and the attachment to that contract, and the TI Supervisor Quick Reference to the Volt Program (Quick Reference), all of which were admitted into evidence, are instructive. The contract between TI and Volt states, in part, "Volt will replace any personnel whom TI finds unsatisfactory. TI reserves the right to accept or lawfully reject any of Volt's personnel submitted for assignments at TI, in TI's sole discretion." In addition, the contract states that "[o]nce Volt has been notified, TI will not be required to pay for the services of Volt's personnel identified as unqualified or incapable." The attachment to the contract states that "Volt shall provide and qualify contractor personnel using TI approved contractor screening and testing processes." In the Quick Reference, the section titled, "Terminations," states, in part, "[t]he TI supervisor is asked to be as specific as possible when requesting the [c]ontractor be released from assignment. . . . The Volt [p]rogram [m]anagers will handle all terminations."

Third, we look to whether TI or Volt had the obligation to pay wages and withhold taxes, and whether the method of Udell's payment was by unit of time or by the job. The contract between TI and Volt provides a formula for calculating the hourly bill rate and states it "includes all direct labor costs, including wages, shift differential, and benefits, as well as any additional items specified in the attachment." The contract also provides for bonuses, overtime, participation in the incentive pool that is tied to TI's profits, and reimbursement by TI for any "safety equipment, job related medical testing, health and safety training, and drug testing." The attachment to the contract states that "Volt shall bill TI between the range of $11.97 to $17.29 per hour for A/T operators, manufacturing specialists and QC specialists." It also states that the hourly rate includes social security taxes, federal and state unemployment taxes, Volt's insurance

costs, including workers' compensation, employee benefits costs, and job support services costs. In addition, the attachment to the contract also contains provisions for overtime pay, shift premiums, holiday pay, and vacation pay. As to payroll, the Quick Reference states a TI Supervisor "must make and approve adjustments to their [c]ontractor's time weekly." Also, as to "checks" it states that the contractors' checks will be available in the Volt branch office for pick up on Fridays or through direct deposit, the forms for which may be obtained from a Volt program manager. Further, Udell testified that while assigned to TI, he was paid $10.53 per hour and received a bonus for completion of his assignments. *Cf. Raynor*, 359 S.W.3d at 911 (concluding, in part, fact issue as to method of payment because no evidence worker received hourly wage and evidence showed he was not paid through company's payroll system).

Fourth, the contract between TI and Volt, and the attachment to that contract address TI's obligation to furnish necessary equipment and supplies. The contract states that "[u]pon receipt of any materials, equipment or tools supplied to Volt by TI, Volt's personnel shall examine such equipment, tools and materials for good repair and appropriateness for the use for which they are intended." The contract also provides TI may reimburse Volt separately for safety equipment. The attachment to the contract states TI will provide smocks, gloves, and other related equipment. Also, Davis testified that once everyone was inside the clean room, they were all working on the same tools.

Fifth, the record provides information as to the time for which Udell was employed. The Quick Reference states, in part, that the TI supervisor is to "[a]pprove and adjust their hours," and "[a]pprove requests from Volt contractors for time off." Also, in the section relating to time off, Volt contractors are required to request leave through the TI time system and those leave requests will be approved or denied by the TI supervisor. In addition, if a Volt worker is going to be late to work, that person is required to contact the TI supervisor and then contact or leave a

–21–

message for the Volt program manager. However, it states that the TI supervisor will contact the Volt program manager to discuss any attendance, conduct, or performance issues. Also, Davis stated that, for Udell and the other Volt contractors on his team, he set their work schedule and hours, decided the hours they worked, determined whether they would have overtime, and approved their time off. *Cf. Raynor*, 359 S.W.3d at 910–11 (concluding, in part, fact issue as to time worker employed because evidence showed worker had worked for less than eight hours over two days, the plan was for the worker "to work just a couple of days," and company knew worker was looking for other, more steady work).

Sixth, and most importantly, we address TI's actual control of the progress of Udell's work and the details of his performance, not just the ends sought or the final result. Udell does not dispute that at the time of his injury he was working on TI's premises in furtherance of its day-to-day business. During the trial, Udell testified that, after carrying "pods" to a work area and loading them onto the machine, he tripped when walking to the next tool. As to the details of Udell's work, the record shows that TI set Udell's work schedule and daily assignments, provided him training, and was responsible for communicating his goals and performance.

The employment agreement between Volt and Udell was admitted into evidence and it required Udell to "comply with the customer's instructions and rules while on assignment with the customer." Also, Davis stated that he or his team lead assigned the people working on their team, including Udell, to the tool they would be working on that day. With regard to Udell's work, Davis stated that he assigned Udell to specific tasks. Davis testified that on the morning of Udell's injury, his specific task had been assigned by Tran, the TI team lead. Similar to Davis's testimony, Tran stated that she would assign individuals to work a specific tool. *See Garza*, 161 S.W.3d at 477 (testimony that supervisors for both client company and temporary employment agency told injured worker what to do on a day-to-day basis and it was client company's

–22–

supervisor that directed the work related to the injury was sufficient for summary judgment purposes to establish client company actually controlled details of work that causes injury); *cf. Raynor*, 359 S.W.3d at 910 (concluding, in part, fact issue as to actual control over the progress and details of work because evidence showed worker determined how he wanted to do the job, it was up to worker where he wanted to start on job, worker had discretion as to welding pattern he wanted to use, and worker was left alone to do job and company's supervisor left site).

Although the attachment to the contract required Volt to "[p]rovide new and on-going training to contractors" it specified that the training was in "subject areas required by TI" and that "the content and format of such training shall be approved by TI." It also required Volt to "provide a full time trainer to facilitate contract personnel's training needs at a cost of $4875/month." The Quick Reference states that the TI supervisor is to "[p]rovide on-the-job supervision and training of Volt contractors." Also, Tran testified that she assigned Udell to training, which could include another Volt contractor if they were certified or qualified. This is not inconsistent with Kamicka Jackson's testimony that "they wanted to train [Udell] on that area, so he kind of worked with me a little bit." In addition, Karla Shepard, a TI employee, testified that she trained Udell, showing him "how to run the process—material and the tools." Udell testified that he was trained by Shepard and Tran, both TI employees, and Jackson, a Volt contractor.

Also, in the Quick Reference section titled, "Performance Reviews," it states, "Volt's [p]rogram [m]anagers will conduct performance reviews with all [c]ontractors assigned to TI in alignment with the TI annual performance cycle. Volt's [p]rogram [m]anagers will request feedback from TI [s]upervisors to assist in the development of an accurate performance appraisal." Although it states that the Volt program managers will conduct the performance reviews, the TI supervisors are to "[p]rovide timely written feedback to the Volt [p]rogram

[m]anager on Volt contractor performance," "[c]omplete performance review forms for contractors provided to [them] by the Volt [p]rogram [m]anager," and "[r]ank [the] performance of Volt contractors with input from the Volt program manager." Also, the Quick Reference states that the Volt program manager is to "[i]nvite the TI [s]upervisor to attend performance reviews."

Having considered the foregoing, we have determined the record reflects Udell was working on TI's premises, in furtherance of TI's day-to-day business, and the details of Udell's work that gave rise to his injury were directed by TI. *See Garza*, 161 S.W.3d at 477. We conclude the evidence conclusively establishes, for the purposes of the Texas Workers' Compensation Act, TI was an "employer" Udell. *See* TEX. LAB. CODE ANN. § 401.122; *Port Elevator*, 358 S.W.3d at 242; *Garza*, 161 S.W.3d at 477.

### c. Was TI Covered By a Workers' Compensation Policy

Finally, we address the parties' third major area of analysis, which requires us to determine whether TI is covered by a workers' compensation policy. TI argues the evidence conclusively establishes and it is undisputed that it has workers' compensation insurance. Udell responds that TI's workers' compensation insurance policy excluded Udell from coverage and TI failed to prove that it's insurance was in effect on the date of the accident.

During a pretrial hearing, counsel for TI argued that, in order to prove its exclusive remedy defense, it would need to put on evidence at trial that it was "an employer under the [Texas Workers' Compensation] Act," "Udell is an employee under the [Texas Workers' Compensation] Act," "[TI has] workers' compensation coverage," and there are no exclusions because Udell participated in the workers' compensation system and "didn't opt out." The trial court asked whether any of those things were in issue. Counsel for Udell responded, "I don't think so" and stated "Well, the only issue would be that's . . . in dispute is the right to control the

–24–

manner and means of performance or the details of the work. . . . There's all this evidence that he was employed by Volt, so I think this is nothing more than an effort to try to taint the jury." The trial court stated, "I had understood those were not in dispute at this point" and counsel for Udell responded, "They're not." Then, the trial court asked Udell's counsel, "So do you stipulate to the matter that he said?" and counsel for Udell answered, "Yes, sir."[3]

Because Udell agreed that TI has workers' compensation insurance, there is no dispute that TI is a subscriber. *See W. Steel*, 206 S.W.3d at 124. Accordingly, we conclude TI was covered by workers' compensation insurance.

### 2. Was TI the Statutory Employer of Udell?

Nevertheless, even if Udell is correct that he was not an "employee" of TI because Volt was an independent contractor, there remains the issue of whether Udell should be "treated as" TI's employee for workers' compensation purposes because TI is his statutory or deemed employer.[4] The parties do not contend that TI became a voluntary statutory employer under section 406.123(a) by agreeing, in writing, to provide workers' compensation insurance to the subcontractor. *See* TEX. LAB. CODE ANN. § 406.122(a); *TIC Energy*, 2016 WL 3136877, at 4; *Entergy*, 282 S.W.3d at 439. In fact, the contract between TI and Volt specifies that Volt will provide workers' compensation insurance. Accordingly, we address whether TI was a "statutory employer" under the "deemed employer" statute in section 406.124.

Section 406.124 applies to a general contractor who has compensation insurance and subcontracts all or part of the work to be performed with the intent to avoid liability. *See* TEX.

---

[3] We note counsel for TI made a bill of exceptions during the trial and TI's workers' compensation insurance policy was admitted into evidence for purposes of the bill.

[4] TI's motions for directed verdict and judgment notwithstanding the verdict do not specifically raise this argument or cite to section 406.124 of the Texas Workers' Compensation Act. However, because we must liberally construe the provisions of the Texas Workers' Compensation Act and apply a "decided bias" for coverage, we follow the majority's example in *Entergy* and apply section 406.124. *See Entergy*, 282 S.W.3d at 438–39 (majority op.), 452–53 (J., Hecht concurring) (discussing policies of Texas Workers' Compensation Act and relevance of section 406.124), 479–80 (J., Willett, concurring) (noting none of parties relied on section 406.124, disagreeing with its application and concluding it is rarely used subterfuge provision intended to thwart sham attempts by employers to avoid liability).

LAB. CODE ANN. § 406.124; *Entergy*, 282 S.W.3d at 439. Paragraph 11 of the contract between TI and Volt states, in part, that:

> Volt assumes all risks and hazards encountered in his/her performance of this Agreement, and further, Volt shall be solely responsible for all injuries, including death, to all persons and all loss or damage to property which are attributed in any way to Volt's performance under this Agreement or that of any agent, employee, or sub-contractor engaged by Volt.

Also, as previously noted, paragraph 13(A)(1) of the contract between TI and Volt, requires Volt to provide workers' compensation insurance. Accordingly, TI satisfies the requirements of section 406.124.[5] Therefore, by operation of section 406.124, for purposes of works' compensation coverage, TI is considered a statutory or deemed employer, Udell is "treated as" TI's employee, and TI is entitled to the exclusive remedy defense. *See Entergy*, 282 S.W.3d at 439. It would be inconsistent with the purpose and intent of the Texas Workers' Compensation Act to conclude otherwise. *See generally, Entergy*, 282 S.W.3d at 439.

### 3. Conclusions—Exclusive Remedy

Construing the Texas Workers' Compensation Act liberally and bearing in mind its "decided bias" in favor of coverage, we conclude that because Udell was TI's employee for purposes of workers' compensation coverage and TI was a workers' compensation subscriber, TI conclusively proved its exclusive remedy defense. *See Port Elevator*, 358 S.W.3d at 243. However, even if Udell was excluded from being TI's "employee" because Volt was an "independent contractor," TI would be Udell's statutory or deemed employer and Udell should be "treated as" its employee. *See generally, Entergy*, 282 S.W.3d at 438–39. Accordingly, the

---

[5] Section 406.124 provides:

> If a *person who has workers' compensation insurance coverage subcontracts* all or part of the work to be performed by the person to a subcontractor *with the intent to avoid liability as an employer* under this subtitle, *an employee of the subcontractor* who *sustains a compensable injury* in the course and scope of the employment *shall be treated as an employee of the person* for purposes of workers' compensation . . . .

(Emphasis added).

–26–

trial court erred when it denied TI's motions for directed verdict and judgment notwithstanding the verdict because the Texas Workers' Compensation Act is the exclusive remedy available for Udell's injuries.

Issues one and two are decided in favor of TI. Based on our resolution of issues one and two, we need not address the parties' remaining issues and cross-issue.

## III. CONCLUSION

The trial court erred when it denied TI's motions for directed verdict and judgment notwithstanding the verdict because the Texas Workers' Compensation Act was the exclusive remedy available to Udell.

The trial court's second amended final judgment is reversed and judgment is rendered in favor of TI on its affirmative defense under section 408.001 of the Texas Workers' Compensation Act.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

141042F.P05

–27–



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TEXAS INSTRUMENTS, INC., Appellant

No. 05-14-01042-CV  V.

ALESSANDRO UDELL, Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-03191.
Opinion delivered by Justice Lang. Justices
Brown and Richter participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is

**REVERSED** and judgment is **RENDERED** in favor of appellant TEXAS INSTRUMENTS,

INC., on its affirmative defense.

It is **ORDERED** that appellant TEXAS INSTRUMENTS, INC., recover its costs of this

appeal from appellee ALLESSANDRO UDELL. The obligations of appellant TEXAS

INSTRUMENTS, INC., as principal, and THE INSURANCE COMPANY OF THE STATE OF

PENNSYLVANIA, as surety, on appellant TEXAS INSTRUMENTS, INC.'s supersedeas bond

are **DISCHARGED**.

Judgment entered this 25th day of August, 2016.